[No. 22233.   Department One.   May 26, 1930.]

*In the Matter of the Guardianship of* HAZEL REBECCA ROHNE *(formerly Trethewey).*

HAZEL REBECCA ROHNE, *Appellant,* v. SAMUEL TRETHEWEY *et al., Respondents.*[1]

[1]Reported in 288 Pac. 269.

*Charles H. Graves* and *Peyser & Bailey,* for appellant.

*McClure & McClure* and *Paul Shaffrath,* for respondent Trethewey.

*Livingston B. Stedman* and *Lewis L. Stedman,* for respondent American Surety Co.

*Caldwell & Lycette,* for National Surety Co.

BEALS, J.—Samuel Trethewey was, November 12, 1914, by the superior court for King county, appointed guardian of the persons and estates of his two minor children, Lauren Briggs Trethewey and Hazel Rebecca Trethewey, then nine and five years of age, respectively. Mrs. Trethewey, the mother of these minors, was a granddaughter of Dexter Horton, who in his will had bequeathed to his great-grandchildren, the two minors above referred to, 692.77 shares of the capital stock of the Dexter Horton Estate, Inc., a corporation, together with approximately $65,000 in cash and securities. The corporate stock above referred to was, at the time of the appointment of the guardian, estimated to be worth approximately $347,000.

Mr. Trethewey, immediately upon his appointment, filed his bond in the sum of $825,000 and entered upon the performance of the duties pertaining to this trust as guardian of his children.

At this time a brief statement of the situation of the Trethewey family is necessary. Samuel Trethewey, the guardian, by trade a mechanic earning about $80 per month gross, had married a granddaughter of

Dexter Horton, a pioneer banker of Seattle who had, in the course of a long and honorable career, accumulated a large fortune. The couple had two children, Lauren and Hazel, and were occupying a small six-room dwelling on Twentieth avenue north, Seattle, which had been given to Mrs. Trethewey by her grandfather. Mr. Trethewey states that, some time prior to his appointment as guardian, he had abandoned his trade and was endeavoring to function as a real estate broker, which endeavor he has persisted in up to the present time, with the result, as he states, that he has never earned, on a yearly average, more than $100 per month gross. The Tretheweys owned some real estate and securities, Mrs. Trethewey also receiving an income of about $1,800 a year from a trust estate established for her benefit by her grandfather.

The 692.77 shares of the capital stock of Dexter Horton Estate, Inc., were of the par value of $100 per share, but were yielding large dividends and seem to have been appraised at $500 per share, the total appraised value being $346,385. In July, 1919, a capital distribution was made on account of this stock as a result of the sale of some of the corporate property, under which distribution the guardian received cash in the sum of $54,607.90, which distribution automatically reduced the book value of the stock from $500 to $450 per share. The most valuable property owned by the Dexter Horton Estate consisted of the ''New York Block property,'' a continuous tract of land, improved with a brick office building, running from Second avenue to Third avenue along the northerly margin of Cherry street in the city of Seattle. The building located on this property yielded large returns and the stock paid handsome dividends until March, 1923, when, the old office building having been torn down and a magnificent modern office building constructed upon

the property, dividends upon the corporate stock were entirely suspended, none having since been paid.

A few months after his appointment as guardian, Mr. Trethewey petitioned the court for leave to expend not to exceed $20,000 of the principal of his children's estate in the purchase of a lot in a good residential district of the city of Seattle and the construction thereon of a dwelling, as a permanent home for his family, and that he be allowed $500 per month, commencing from the date of his appointment, for the maintenance of this home and the support and education of the minors. In this petition, Mr. Trethewey alleged that he was worth about $20,000 in real estate, being his half of a community estate of approximately $40,000, but that it was not possible for him, out of his own means, to provide and maintain a suitable home for his children.

On the hearing on this petition, the court authorized the purchase of the lot and the construction of a house, and allowed Mr. Trethewey $250 per month for the maintenance of the home and the support and education of the two children, this order reciting that the estate of the minors was yielding an income of about $16,000 per annum. The house was subsequently furnished out of the wards' estate at a further expense of approximately $5,000, and the monthly allowance to the guardian was increased, commencing January 12, 1916, to $500 per month. At approximately the same time, the guardian was authorized to expend not more than $4,600 in the purchase of an automobile "for the use of said wards."

August 12, 1919, the allowance to the guardian was increased to $600 per month, and an additional $1,000 was allowed to cover Lauren's expenses at a boy's school during the school year 1919-1920. July 20, 1922,

the monthly allowance to the guardian was increased to $700, additional allowances being made from time to time to cover expenses in connection with Lauren's education and Hazel's expenses at a boarding school, together with the purchase of additional automobiles.

Lauren Trethewey came of age in October, 1926, and shortly thereafter the guardian filed a final account as to Lauren's estate, the property was divided, Lauren's share being set off to him, and an order was entered finally discharging the guardian in so far as his son was concerned, and continuing the guardianship as to Hazel.

By his eleventh annual report and account, filed November 25, 1925, the guardian reported that:

". . . since the suspension in 1923, no dividends have been declared by the Dexter Horton Estate; in all likelihood there will be none declared during the coming fiscal year of the estate. For this reason it will be necessary to continue the policy of utilizing and drawing on a portion of the principal assets of the estate for the adequate support, maintenance and education of said wards. It is the guardian's best judgment that this policy will be best for said wards' permanent interests and welfare; he therefore respectfully asks the court to confirm said policy and authorize the expenditure, when necessary (during said suspension of dividends above mentioned) of such reasonable amount of the principal assets of said wards' estate as may be required for said purpose."

After the discharge of the guardian as to Lauren, the monthly allowance of $700 to the guardian ceased, and the guardian seems to have drawn from Hazel's estate for maintenance of the home $75 per month for two and one-half years, Hazel being away at school, save during vacations.

In addition to the allowances to the guardian above referred to, the parents and their children took several trips at the children's expense, on one occasion the

guardian receiving $500 to enable him to go to Chicago to meet his family on their return. During the time consumed on these trips, the guardian continued to draw the regular monthly allowance as fixed by the court. The expenses of the children at different schools and their doctors' bills were also charged against the estate in a large sum. Attorneys' fees in the sum of $9,650 were paid out of the joint guardianship estate, and later from Hazel's estate an additional payment was made in the sum of $550.

March 31, 1929, Hazel Trethewey and Lyle C. Rohne were married in California, where Hazel had been attending an art school. At this time Hazel was not quite twenty years of age, she having been born June 27, 1909. Her father was not advised of her marriage until after the same had taken place, and for a while thereafter withheld his consent thereto, but later filed his final account as guardian, consenting to her marriage and asking that his accounts be settled and that he be discharged. To this final account Mrs. Rohne filed numerous exceptions, and from an order approving the same and making certain allowances to the guardian and his attorneys, she appeals.

The trial court made findings of fact and conclusions of law in accordance with the guardian's contentions, and approved the guardian's report in all particulars. In the order approving the final account, the court distributed the remainder of the property in the hands of the guardian, including $1,715 in cash, to appellant, allowed $1,900 to the guardian's general attorney, $5,000 to special counsel who were retained by the guardian to assist him in presenting his account and resisting the exceptions thereto filed by appellant, awarded the guardian compensation in the sum of $6,-108.92, and directed the payment of several small items due from the estate. The allowances made by the court

exceeded by a large amount the cash on hand, and the order provided that, if the appellant, within thirty-one days, should pay into the registry of the court something over $11,000, the estate should be distributed to her; otherwise, upon report by the guardian, the court should order the sale of some portion of the assets of the estate to raise funds with which to pay the allowances.

Appellant assigns error upon the admission of certain testimony over appellant's objection, upon the making of certain of the findings of fact and conclusions of law, upon the approval of the guardian's final account, upon the allowance of general and special attorneys' fees and compensation to the guardian, and in denying appellant's motion for a new trial.

During his guardianship, respondent filed annual reports showing his proceedings as guardian. Orders were entered upon these reports, approving the same and directing the guardian in certain particulars. Respondent concedes that the orders entered, approving the accounts and allowing certain expenditures, are not *res judicata* or absolutely binding upon appellant, but contends that the orders are *prima facie* correct, and that, in attacking the same and expenditures made pursuant thereto, the burden of proof rests upon appellant. On the other hand, appellant contends that the orders are mere nullities, and that the same do not constitute even a *prima facie* showing in favor of respondent. We do not find it necessary to determine the effect of these orders upon the situation now before us. In so far as we hold the trial court erred in entering the order now before us for review, we reach that conclusion assuming, for the sake of argument, that the orders have all the weight contended for by respondent; while, in denying appellant further relief, we base

our holding upon considerations other than the entry of the orders upon which respondent relies.

At the time respondent was discharged as guardian of his son Lauren, he was allowed $3,000 for his services as guardian, one-half of which was charged to appellant.

Appellant lived with her parents in the home built under order of the court, as above set forth, until February, 1925, when she, being then nearly sixteen years of age, was placed in an excellent girls school, where she remained, visiting her home during vacations only, for over three years. In the fall of 1928, she entered an art school in California, where she remained until her marriage. While in California, she received $100 a month from her estate, out of which she maintained herself and paid her tuition. It appears that, during the fall of 1927, her parents became estranged and separated, and that they have not lived together since that time. There is testimony in the record to the effect that, for some time prior to this, her parents had quarreled bitterly, and that their home life was not happy.

Shortly after her marriage, appellant appeared in the guardianship proceeding and sought to require her guardian to turn over to her some of her money, he having refused, after learning of her marriage, to continue her allowance. Shortly thereafter, the court designated a competent public accountant to make an audit of the guardian's books and file a full report concerning the same, which report is now before us as part of the record herein.

It is, of course, evident that, in the course of the guardianship proceeding, many difficult questions were presented, upon which reasonable minds might differ as to the proper course to be pursued. It is not easy to reach the best solution in handling a situation in

which it appears that children of impecunious parents are possessed of a large fortune. On the one hand, the children must be brought up with a view to their future condition and station in life, while on the other hand, most careful regard must be paid to the conservation of their estate, to the equities of the situation and to the true interests of all concerned, children and parents.

It is undoubtedly true that the home owned by appellant's mother was not pleasantly situated, it being located next door to a riding academy and in a rather undesirable residential district. At the same time, in view of the circumstances of the parents, they having considerable property, it would seem that the construction of an expensive home at the children's expense for use by the family, and the maintenance of the home, without any contribution whatever from the parents, was unjust to the children and for other reasons ill advised. A situation might well exist in which it would be perfectly proper to appropriate a portion of the capital of a trust estate to the purchase of a home for the beneficiary of the trust, but instances in which this should be done for minor children must certainly be of rare occurrence.

In the natural course of human events, it is often advisable that children leave home to attend school or university, as did the Trethewey children. It may be necessary that, for other reasons, the children leave the locality, and, as they become of age, it must be expected that they will leave the family domicile and set up establishments of their own, which would oftentimes result in the home falling to the last one to reach the age of majority, which would frequently be unfair and be a potent factor in creating family dissension, as frequently the home would not be at all suited to the

needs of the person to whom it would fall on the ultimate closing of the guardianship proceeding.

If, in this instance, the court had directed that a suitable dwelling in a good neighborhood be rented by the guardian, a considerable portion of the rent to be paid out of the children's income, the balance by the father, the result would have been far more equitable and advantageous to all concerned. It appears, however, that the investment in the home has resulted in no loss to the estate, and that appellant has accepted the property as part of her share of the estate. We therefore feel that, under all the circumstances, no remedial action is called for in this connection.

It is, of course, primarily, the duty of parents to support their minor children. 28 C. J. 1118-20; *In re King,* 151 Wash. 120, 275 Pac. 82; *In re Gardella,* 152 Wash. 250, 277 Pac. 846. In the guardianship now before us, not only did respondent fail to provide for his children, but it is very evident that they provided very liberally for him, it being apparent that the allowance of $500 or more per month drawn from November 12, 1916, would much more than pay the current household bills and the reasonable expenses of two minor children, even under far more extraordinary or unusual circumstances than respondent suggests existed in this instance.

In his report above referred to, the guardian himself reported to the court that in March, 1923, the income from the corporate stock owned by the trust estate had ceased, with little likelihood that further dividends would be received for some time to come. Just prior to this very great reduction in the income of the minors, the monthly allowance to the guardian had been increased from $600 a month to $700 a month, and this extravagant allowance was continued for

quite a while thereafter, being paid out of the *corpus* of the estate.

At no time did the guardian attempt to account for the disbursement of this monthly allowance to him for the support of his wards, save by filing his receipt for each monthly payment. It must be remembered that, in addition, such expenses as taxes, repairs, insurance, cleaning and care of the lawn, etc., were paid directly out of the minors' estate, these items amounting in all, as against the estate of the two children, to over $9,700, and as against Hazel's estate, to approximately $2,000, after the guardianship was continued as to her alone. The children were also jointly charged in addition with their expenses at school, including medical expenses, while over $4,000 was charged on this account against Hazel alone after the continuation of the guardianship as to her. The guardian even went so far, as to charge against the trust estate a $25 subscription to the Red Cross, which was, of course, wholly improper.

We agree with respondent that it is the law that, in proper cases, minor wards may be supported from their own estate, where it is shown that the parents have not the requisite ability to support the wards in a position and station commensurate with the wards' expectations and station in life, and that the *corpus* of the wards' estate, as well as the income, may, when necessary, be used for the support, maintenance or education of the children.

In applying these principles, however, great care should always be taken. to see that the estate of the ward is conserved to the utmost degree consistent with the ward's welfare, and only in rare instances and under most unusual circumstances will the principal of a ward's estate be used for his benefit when the

father is living with his family and is laboring under no physical or mental disability.

Respondent cites the case of *Des Moines Savings Bank v. Krell,* 176 Iowa 437, 156 N. W. 858, in which the supreme court of Iowa approved expenditures made by a mother out of the principal of the estate of her wards, who were her children, in maintaining a home for her family. It appeared that the mother had expended all of her property in maintaining her home, and was reduced to the alternative of either seeking employment and hiring someone to care for her children, or of herself caring for them and using their money for living expenses. The probate court authorized her to do the latter, and in so acting was undoubtedly correct, and the supreme court, in approving this action, followed sound precedent, as well as the principles of justice and equity. We are in hearty accord with the position of respondent's counsel that, wherever possible, a family should be kept together; but we find no authority for the proposition that an able-bodied, though impecunious, father may be supported in luxury and extravagance out of the estate of his minor children.

Granting that, in the case at bar, it was for the best interests of the children that a good home be maintained where the family could live as a unit, granting that the family should reside in a comfortable home in a good neighborhood, and that the reasonable expenses of providing and maintaining such a home should be paid out of the wards' estate, and granting that by the maintenance of such a home the parents must necessarily profit, it is nevertheless true that, in such cases, the gain to the parents must be limited to such advantage as is necessarily incident to the maintenance of the home for the children. When the advantage to the parents exceeds such incidental benefit, it becomes

wrongful and such as should not be approved·by any court.

In the case at bar, we are satisfied that the allowance, as first established, in the sum of $250 a month was reasonable, but that the increase to $500 made during the year 1916 was not justified; that the subsequent increases to $600 and $700 a month, respectively, were erroneous; and that, when the principal source of income of the estate ceased, the failure of the guardian to suggest that the monthly allowance be reduced was highly reprehensible.

Such a case as this is nowise analogous to that of a widowed mother left with minor children, who, after she has used all her own means in the support of her family, is compelled to use the capital of her wards' estate to maintain a home and educate her children. The facts in such a case, when compared with that now before us, are so utterly different as to require no extended discussion.

We agree with respondent's contention that, in guardianship proceedings, the court will generally heed the suggestions of the guardian and will pay much attention to his views as to the best course to pursue. This being true, the responsibility rests the more heavily upon the guardian to exercise his judgment wisely in making recommendations to the court and to avoid action which will result in improper personal profit to himself. When, upon passing upon a guardian's final account, it appears that the acts of the guardian, even though approved by the court, have resulted in injustice to the ward, it is the duty of the court to scrutinize the account carefully and to disallow expenditures, even though the same were allowed by the court having immediate jurisdiction of the proceeding, if it appears that the same were improvidently approved and were manifestly in deroga-

tion of the rights of the ward, and of such a nature as to amount in law to the exercise of bad faith on the part of the guardian.

Relying upon the principles above set forth, we do not surcharge the guardian's account in so far as money expended for expensive automobiles and the upkeep thereof or for trips taken by the family are concerned, holding that as to those items the judgment of the guardian and of the lower court need not be interfered with.

In considering such a situation as was presented by the Trethewey family, it must be remembered that the children will soon become of age, and that the support of the parents in luxury out of the children's estate will have a most unfortunate effect upon them, as well as upon the children. It establishes a false relation between the members of the family; the father is not encouraged to earn even what little he is capable of earning, and he becomes dependent upon his children. Such a course of conduct as that followed in this instance is almost certain to bring about that result which is most to be avoided, and which is now here presented, that of a family torn by dissension; children of age and married, with families of their own; a father in worse condition to earn a living, if possible, than he was fifteen years ago when the guardianship was instituted; and a young ward who, in coming of age, finds herself in want of money and, indeed, under the order appealed from, indebted to the trust estate in a large amount. It would seem apparent that to turn over to a father from $500 to $700 a month out of his wards' estate for the maintenance of a beautiful home for himself and his family could only result in heart burnings and family dissension when the time comes when the payments must cease. We are satisfied that, in this case, the benefit to the parents from the estate

of their children far exceeded such incidental benefit as is proper in cases where the children are wealthy and the parents impecunious.

Respondent cites other authorities to the effect that, in proper cases, allowances will be made out of the child's estate for its support according to its expectations, but the facts of these cases all differ greatly from the facts of the case at bar, and the decisions are not authority for the allowances which were made in this proceeding.

We are clearly of the opinion, in view of all the circumstances of the case, that, from November, 1916, to November, 1919, an allowance of $350 a month was as much as can, under any theory, be approved; that from November, 1919, to March, 1923, no allowance in excess of $400 can be allowed; that from March, 1923, when the income from the major portion of the estate ceased, to October, 1926, no allowance in excess of $300 a month was justified. Upon remand, respondent will be allowed as against appellant an appropriate credit upon the basis of allowances as above specified.

We now consider the question of allowances for attorneys' fees. The order appealed from, in so far as the same approved all prior allowances by way of compensation to the guardian's general counsel, is affirmed. During the course of the guardianship, respondent's counsel prepared with care many reports, petitions and orders, and we do not find the slightest indication that counsel at any time attempted to deceive the court or in any way encouraged or permitted any misrepresentation to be made by or on behalf of the guardian. It must be remembered, however, that great stress is laid by counsel, who appear in opposition to the claims of appellant, upon respondent's limited experience and mental capacity. In such a case a peculiar and unusual responsibility rests upon his

counsel. We are so thoroughly satisfied that many of the guardian's recommendations to the court, as contained in his reports, accounts and petitions, indicated poor business judgment and a lack of appreciation of his obligations and responsibilities towards his wards, having particular regard to the fact that when the principal source of income of the estate ceased no reduction whatever was made in the allowances to the guardian, that we feel that, in view of all the circumstances, no further allowance should be made to respondent by way of compensation to his general counsel. The chief burden of supporting the final account was borne by counsel retained specially for that purpose. The order appealed from, in so far as the same allows further compensation to respondent's general counsel in the sum of $1,900, is reversed, and no further allowance to such counsel will be made.

In regard to respondent's special counsel, Messrs. McClure & McClure, who appeared in his behalf to assist him in maintaining his final account and report as filed, the allowance for compensation to such counsel as made by the trial court will, in view of our conclusion as to the merits of the questions presented on this appeal, be reduced to $1,500.

Respondent himself will be allowed no compensation whatever for his services as guardian as against appellant. The allowance heretofore made to him, in so far as the same affects appellant's estate, will be vacated and set aside.

After careful consideration, we have concluded that the order appealed from will be affirmed, save in the particulars hereinabove outlined. It is suggested that there are some manifest errors in the guardian's account. If such are made to appear to the trial court upon the final hearing pursuant to the remand hereby

ordered, they can be corrected by the trial court in the final order to be entered.

During the course of the guardianship, the guardian's bond was, from time to time, greatly reduced in amount. The effect of these orders reducing the guardian's bond is argued pro and con by the respective parties to this appeal. At this time we deem it sufficient to direct that neither the official bonds of the guardian be exonerated nor his bondsmen discharged until final settlement of this proceeding according to the law and the directions contained in this opinion.

The order appealed from is reversed and the cause remanded, with instructions to enter a new order in conformity with this opinion, the parties at the time such order is presented to be permitted to present any arguments which they may have as to mathematical errors or evident duplications of charges contained in the guardian's account.

MITCHELL, C. J., TOLMAN, MAIN, and PARKER, JJ., concur.