[No. 36244. En Banc. October 30, 1962.]

*In the Matter of the Guardianship of* VICTORIA IVARSSON,
*a Minor.*

E. K. HARRISON *et al., Appellants.**

*Reported in 375 P. (2d) 509.

734

*McMicken, Rupp & Schweppe* and *Hennings, Maltman & Weber,* for appellants.

*Stuart G. Oles,* as guardian ad litem, pro se.

*Bogle, Bogle & Gates* and *Thomas L. Morrow,* for Julie Vance Ivarsson.

PER CURIAM.—This is an appeal from certain portions of the "ORDER ON FIFTH REPORTS OF CO-GUARDIANS" entered

"In the Matter of the Guardianship of Victoria Ivarsson, A Minor."

We are concerned with the guardianship of the estate, and not with the guardianship of the person of Victoria Ivarsson (formerly Harrison), now ten years of age, who lives in Zermatt, Switzerland, with her mother and her mother's second husband (who is the ward's adoptive father) and five younger half brothers and half sisters. The mother is co-guardian, with a Seattle bank, of the ward's estate, the corpus of which now exceeds two and a half million dollars. The income was estimated by the trust officer of the bank at $60,000 a year gross, *i.e.*, before taxes. The cash receipts, between February 2, 1959, and January 31, 1960, aggregated $66,872.30; and between February 1, 1960, and January 31, 1961, $73,123.76. This estate comes to the ward by inheritance through her father, who died shortly after she was born.

In addition to the co-guardians, a guardian ad litem has been appointed to continue in that position until the further order of the court.

The appeal, while nominally by the ward's paternal grandmother and her husband, is clearly intended not for their benefit, but for that of the estate of the child.

Many pages in the briefs are devoted to an analysis of cases, statutes, and rules to determine whether the grandmother is an aggrieved or an interested person, and thus entitled to appeal; all of which, it seems to us, misses the most important point.

If there is an aggrieved or interested person entitled to appeal, it is the ward. It is her money that is being so freely and generously distributed. Her right to appeal must be conceded; but inasmuch as she is unable to exercise it, there must be a determination as to who is entitled to appeal in her behalf. The right of appeal by a prochein ami, or "next friend," in such circumstances, has long been recognized. *William v. Cleaveland* (1904), 76 Conn. 426, 56 Atl. 850, and cases cited.

This is, in substance and effect, an appeal by a "next friend" who conceives that the ward's estate is being

wrongfully dissipated and has so indicated to the probate court by chapter and verse. This appeal is properly before us, unless it is precluded by the fact that there are parents who would normally be the "next friends" of the child; also, co-guardians of the estate of the ward, and, further a continuing guardian ad litem.

The issues raised by this appeal put every one of the parties, who would normally be expected to be protecting the ward's interest in this estate, in an adverse position; the fees to the mother, as co-guardian, to her attorneys, and to the guardian ad litem are challenged, as is an allowance of $750 a month for the support and maintenance of the child (which allowance will be expended for the benefit of the entire family of which she is a part).

It is recognized that a guardian may be disqualified to appeal by an interest hostile to that of the ward, or may, for other reasons, be an improper or unsuitable person to prosecute such an appeal. *Williams v. Cleaveland, supra.*

The fees for the mother, as one of the co-guardians of the estate, and of her attorneys are specifically under attack by the notice of appeal. Her lack of interest in appealing the order entered by the trial court is patent; and her conflict of interest with that of the estate of her ward is clear. When a probate court is called upon to determine the fees of a guardian and of his attorneys, which are to be paid from the estate of his ward, this obvious conflict of interest has caused probate courts to appoint guardians ad litem to represent minor wards in the hearings on such interim accounts of their guardians, as the one now under consideration. Such an appointment tends likewise to protect the guardian and the attorneys, should the ward—after attaining majority—challenge the value of services rendered or the amount of the fees allowed.

The next question is: Does the appointment of a guardian ad litem, who clearly has a right of appeal[1], eliminate any necessity for permitting an appeal by a "next friend."

The fee allowed the guardian ad litem may, as in

---

[1]See Annotation in 115 A. L. R. 571, beginning at 575.

this case, be under attack. That a guardian ad litem may make a mistake in judgment, which brings about a situation which should be reviewed by an appellate court, is made clear in the recent case of *Haden v. Eaves* (1950), 55 N. M. 40, 47, 226 P. (2d) 457. In that case, it is said:

". . . we fully approve the doctrine that courts of equity should not sit idly by and see guardians lose the estates of their wards through mistakes in judgment or neglect of their duties. We also approve the rule that a minor who has a case in court is represented not only by his guardian ad litem, but by the court itself. A guardian ad litem is an arm of the court whose function is to protect the ward, and a court must not permit its arm to strangle him.

"Here we have a case where the interests of the minor and his father [who was the guardian ad litem] are separable; both have appealed and we see what we believe to be a serious error made in the case against the interests of the minor. We cannot in good conscience sit with folded hands, adopt the attitude of umpires in a contest between adults, apply our ordinary rules of civil procedure and say that because of a mistake of the guardian ad litem in trying the case on an erroneous theory the minor must lose all. . . ."

We have taken the same attitude, expressed in the foregoing quotation, relative to permitting "ordinary rules of civil procedure" to block appellate review of matters relating to the rights of minors. See *In re Deming* (1937), 192 Wash. 190, 200, 73 P. (2d) 764, 770.

In the *Deming* case, on an appeal from an order settling the account of successive guardians, there had been no cross-appeal by the guardian ad litem, representing the minors, from a portion of the decree that was adverse to them; and appellants (the guardians and their sureties) asserted that, there being no cross-appeal, no relief could be accorded the minors. We accorded this contention scant consideration, saying:

". . . This argument is not sound. This court may notice and correct any evident error prejudicial to the minor respondents, even though they have not appealed.

In the case of *Glade Coal Mining Co. v. Harris*, 65 W. Va. 152, 63 S. E. 873, the court of appeals of West Virginia laid down the rule as follows:

" '. . . on appeal an infant will be given the benefit of every defense of which he could have availed himself, or which might have been interposed for him in the trial court; and that where the record shows error, as to a minor defendant, the judgment will be reversed, though there is no appeal on his part, it being the duty of the chancellor, as the guardian of infants, to protect their rights.'

"This doctrine is also supported by the following authorities: *Title Guaranty & Surety Co. v. Foster*, 84 Okla. 291, 203 Pac. 231; *Kempner v. Dooley*, 60 Ark. 526, 31 S. W. 145; *Parken v. Safford*, 48 Fla. 290, 37 So. 567."

If some phase of a guardianship proceeding is before an appellate court, it will act sua sponte to protect the apparent interests of the ward or wards; and it will not dismiss a meritorious appeal by a "next friend" in such a proceeding merely because a guardian ad litem has been appointed. To quote again the language of the New Mexico court in *Haden v. Eaves, supra*, we are not inclined to "adopt the attitude of umpires in a contest between adults" and to "apply our ordinary rules of civil procedure" to prevent meritorious appeals involving the rights and property of minors and incompetents.

■■■■ It is urged that appeals by "next friends," in such cases, could flood the court with frivolous appeals by litigious individuals, designed, in some instances, to harass and embarrass the administration of estates. We have no such fears. Not only are there substantial expenses involved in any appeal, but there is the quick-sifting process by a motion to dismiss a frivolous appeal. Nor are we without means to prevent the abuse of the appellate process. We are satisfied that this appeal presents issues which should be determined.

The motion to dismiss the appeal is denied.

The "next-friend" appellants challenge, on this appeal, three specific payments authorized by the probate court, *i.e.*, the co-guardian's fee of $3,500 for services between February 1, 1960, and January 31, 1961; her attorneys' fee

in the amount of $2,520 for the same period; and the guardian ad litem's fee of $1,500 and expenses in the amount of $151.99 for the same period. Also challenged is the ruling of the probate court that no receipts or accounting are required covering the expenditures of the $750-monthly allowance for the support of the ward, and that such amount is an appropriate allowance under the circumstances.

We agree with the appellants that the fee of $3,500 to the mother of the ward, for services as co-guardian of the ward's estate, is not warranted. The guardian ad litem referred to the fee, in argument before this court, as "pointless"; and the probate judge, as shown by the record, has heretofore indicated that her services in managing or preserving the estate are valueless. Nor is she entitled to compensation as guardian of the person of her daughter, as there is no reason why she should be compensated for doing what any mother does. A nominal fee would seem to be adequate for the minimal duties entailed as a co-guardian of her daughter's estate, since the other co-guardian (the bank) does all the work. The guardian ad litem suggests that in this particular year the trip from Switzerland to California, occasioned by the litigation[2] commenced by the appellants in Placer County, California, presents a peculiar and "presumably non-repetitive" circumstance that warrants special consideration. Complete expenses incurred in the trip by the mother

---

[2]The litigation to which reference is made was by the appellants, Mr. and Mrs. E. K. Harrison (she being the paternal grandmother of Victoria Ivarsson), in an attempt to prevent the return of Victoria, who was then visiting them, to her mother and adoptive father in Switzerland; and an attempt to make her a ward of the Superior Court of the State of California for Placer County. This necessitated that Mr. and Mrs. Ivarsson come from Switzerland to regain their daughter. The cost of this litigation to the estate—in travel expenses, attorneys' fees, expert witnesses, and the like—was in excess of $12,000.

We can understand some of the feeling (which we detect) against the intervention in this proceeding of the appellants whose well-intentioned, but misguided, efforts have cost the estate (they are now endeavoring to protect) a very considerable amount. Past mistakes have no bearing on the merits of the present controversy.

and her husband (the adoptive father) have been paid by the ward's estate.

Whether or not, as guardian of the person of her daughter, she was entitled to compensation for loss of time as well as travel expenses, was not presented to the probate court. We are here concerned solely with an award of $3,500 made for services as co-guardian of her daughter's estate for the period February 1, 1960, through January 31, 1961. We are satisfied that such an award for that purpose was without justification. The probate court should make a realistic reappraisal of the value, if any, of her services in that capacity to the estate of her ward.

It is, further, our conclusion that all other matters challenged on this appeal should also go back to the probate court for further consideration, in the light of the views hereinafter expressed.

The probate court made an allowance of $750 a month from the ward's estate for the care, support, maintenance, and education of the ward. We question whether any allowance was justified on the showing made. This we regard as the most important issue for the probate court's determination.

The law is very clear that it is the obligation of parents to support their children and that there should be no support money paid from a child's estate, unless and until it is established that the parents are unable to adequately support that child. *In re Deming* (1937), 192 Wash. 190, 200, 73 P. (2d) 764; *Goodwin v. American Surety Co. of New York* (1937), 190 Wash. 457, 68 P. (2d) 619; *In re Rohne* (1930), 157 Wash. 62, 288 Pac. 269; *In re King* (1929), 151 Wash. 120, 275 Pac. 82, 67 A. L. R. 1397.

We have had occasion to comment on the difficulties presented where the estates of children are used to support impecunious parents in a manner beyond which their own resources would make possible. *In re Rohne, supra.*

Here we have parents who are by no means impecunious. There was recently before this court[3] an appeal from a

---

[3] *In re Ivarsson* (August 23, 1962), *ante* p. 417, 374 P. (2d) 179.

judgment dismissing an application to vacate the decree of adoption, dated January 20, 1954, by virtue of which Victoria was adopted by Karl Roy Ivarsson (then but recently married to Victoria's mother). His application for adoption alleged that he was:

". . . ready, willing and financially able to provide said child with a good home and with proper care, maintenance and education in all respects as if the child had been born unto him."

The mother, concededly, has an income of $500 a month from what is referred to in the record as a half-million-dollar trust fund. She at no time has represented that she does not have other resources and means with which to support her children; indeed she quite frankly says, in a petition asking for the $750 allowance,

". . . that Julie Vance Ivarsson and her husband, Karl R. Ivarsson, are *without sufficient income in their own right without depleting their capital assets to care for and provide for said Victoria Ivarsson* and there is more than ample income from the earnings of the assets of the estate of said minor for said purpose without any expenditure of principal." (Italics ours.)

It is our view that parents with capital assets of half a million dollars, and indeed where the amount is much less, will not be heard to say that they should be permitted to live on the income of one of their children because they prefer not to use a portion of their capital assets for the support of the family.

Assuming that Mr. Ivarsson has, since 1954, somehow lost the "ready, willing and financially able" status, which he possessed or professed at the time of the adoption, the mother's ability to care for, support, maintain and educate her child merits further consideration.

The probate court erred in assuming that a parent's obligation to support his or her child does not go beyond the limits of their current income in the fortuitous circumstance that the child has an independent income. The real issue is: Do these parents, or either of them, have the

means and resources to adequately support Victoria without impoverishing themselves.

If, after further consideration of the assets and resources of the parents, the probate court is convinced that an allowance from Victoria's estate is necessary for her care, support, maintenance and education, we would make it clear that we are not quibbling as to the amount, and that we have no objection to an allowance in whatever amount may be found necessary to balance the family budget.

This balancing of the family budget by payments from the ward's estate is predicated upon the philosophy of the probate court: That this family should be kept together; that all of the children should be treated alike; and that Victoria should have no preferential treatment, at least while she remains in the home. It, therefore, follows that, if needed, a sufficient amount should be paid from Victoria's estate to maintain an appropriate standard of living for her, her mother, her adoptive father, and her five younger half brothers and half sisters.

It is not our function to agree, or disagree, with this philosophy; but the appellants are right in suggesting that the probate court ought to have something more convincing than the collection of figures—said to represent the monthly expenses of this family of two adults and six children, then under eleven years of age[4]—to justify pouring approxi-

---

[4]

| | |
|---|---|
| Rent | $ 190.00 |
| Medical and dental | 100.00 |
| Clothing | 200.00 |
| Groceries | 320.00 |
| Taxes and insurance | 250.00 |
| Auto expense | 100.00 |
| Miscellaneous household expenses | 100.00 |
| Entertainment, recreation, sports and travel (exclusive of traveling to the United States, which has been paid for from the ward's estate) | 150.00 |
| Church and charity | 30.00 |
| Nurses and household help | 200.00 |
| TOTAL | $1,640.00 |

mately a thousand dollars[5] a month of Victoria's money into this home in Switzerland to balance a budget of $1,640 a month. We wonder (with the appellants) at the $100 a month for auto expense, when Zermatt has no automobiles; and $190 for rent when living in a hotel owned by Victoria's adoptive father.

■ If an allowance is made for Victoria's support, we agree with the appellants' contention that an accounting should be made of the expenditures.

We share the probate court's impatience with the idea that there must be a voucher for every stick of gum, every hair ribbon, and every pair of stockings purchased for the ward, but we do not believe the appellants' contention goes to that extent. In any guardianship estate, the probate court may authorize the payment each month to the guardian or custodian of the ward of a designated amount (in the nature of a petty cash account) sufficient to cover a multiplicity of minor expenses, and the guardian or custodian's receipt therefor is the only voucher required.

We disagree, however, with the view that there is one rule applicable to small estates and another to large estates; and would not agree that a receipt from the mother, as guardian of the person of the ward, is all the receipt that is necessary for a monthly allowance of $750 for support paid by the estate. There should be a receipt for all expenditures, except those from the petty cash account.

There remains for consideration only the question of the fees of the guardian ad litem and the attorneys for Julie Vance Ivarsson, as co-guardian of the estate.

As to the guardian ad litem, if the hearing within the area which we have indicated should be explored (relative to the capital assets of Mr. and Mrs. Ivarsson) and should require more time and effort on his part, the probate court should determine compensation commensurate therewith.

---

[5]We arrive at this figure because the family income, as testified to, was: Mr. Ivarsson $200 a month; Mrs. Ivarsson $500 a month; leaving $940 a month to come from the estate. The probate court met this with a $750 a month allowance for Victoria's support and a $3,500 fee to Mrs. Ivarsson as co-guardian of the estate.

We find no basis for the objections made by the appellants to either the fee allowed or his expenses.

█ As to the fee of $2,520 allowed the attorneys for the co-guardian, Julie Vance Ivarsson, it may well be a reasonable fee under the circumstances, but the evidence offered in support thereof seems inadequate.

The attorneys for the bank, the co-guardian who actually administers the guardianship estate, received a fee of $1,750.

It may be that the problems of advising Mrs. Ivarsson what not to do, as co-guardian, are more onerous and complex than advising the bank what it can and should do; but that was not made clear.

The only testimony offered in support of the attorneys' fee of $2,520 was that a member of the firm had put in:

". . . 71¾ hours part-time figured at the rate of $35, amounting to $2,476.25; associate's time of 1¾ hours at $25, $43.75, totalling $2,520."

The time required is only one factor in determining the reasonable value of services; further evidence should be presented as to what problems of Mrs. Ivarsson, in her capacity as co-guardian of the estate, were involved.

While we are here concerned with the guardianship of the estate of Victoria Ivarsson, and not of her person, we suggest that the probate court—in determining what expenditures are to be made on behalf of the ward—is entitled to know something of the home conditions, the educational advantages being accorded the ward, and what the future plans are to fit her for the tremendous responsibilities that a fortune such as hers entails.

The case is remanded to the superior (probate) court for further proceedings in connection with the fifth report of the co-guardians, taking into consideration the views herein expressed.

DONWORTH, J., did not participate.

---

December 13, 1962. Petition for rehearing denied.