[No. 26275.   *En Banc.*   November 15, 1937.]

*In the Matter of the Guardianship of* ROBERTSON P. DEMING *et al., Minors.*

PIERSON P. DEMING *et al., Minors, by Earl G. Rice, their Guardian ad Litem, Respondents,* v. UNITED STATES FIDELITY & GUARANTY COMPANY, *Appellant.*[1]

[1]Reported in 73 P. (2d) 764.

194

*Preston, Thorgrimson & Turner,* for appellant.

*Earl G. Rice, Roberts & Skeel,* and *Wm. Paul Uhlmann,* for respondents.

*George B. Cole* and *John Wesley Dolby, per se.*

BEALS, J.—This case involves the accounts of the guardian of three minors. Trial before the superior court consumed over forty days, and the statement of facts contains 5,769 pages.

Briefly stated, the facts giving rise to the litigation are as follows: Clarence P. Deming and Helen Presbrey intermarried November 12, 1912. Three children were born to them: Robertson, born July 15, 1914; Pierson, born December 25, 1917; and Helen, born December 4, 1919.

Mrs. Deming died February 28, 1920, leaving only her interest in a small community estate. By her will, Mrs. Deming left all her property to her husband, but, as none of her children was mentioned in her will, as to them she died intestate. At this time, Mr. Deming was ill and was indebted in a considerable amount. The community assets included Mrs. Deming's diamond

ring and an automobile, which personal property the trial court valued at $2,237.50.

Mr. Deming was appointed executor of his wife's will, and notice to creditors was published, no further proceedings having been taken. Mr. Deming continued to use the automobile until 1925, when he turned it over to one of his creditors in settlement of an indebtedness of three hundred dollars.

February 11, 1921, Mr. Deming was appointed guardian of the persons and estates of his three children, Messrs. Cole and Dolby representing him as his counsel. Upon his appointment, Mr. Deming furnished a bond in the sum of five hundred dollars, with the Fidelity and Deposit Company of Maryland as his surety. The late Honorable King Dykeman, then a judge of the superior court of King county, signed the order appointing Mr. Deming and also approved the bond. Mr. Deming continued as guardian of his children until February 2, 1931, when he was removed by Honorable Everett Smith, now deceased, who for many years had been judge of the superior court for King county, presiding over the probate department and acting as juvenile judge.

While acting as guardian, Mr. Deming received something over $58,000, which came to his children from the estates of their maternal grandparents and an uncle, all of whom died residents of the state of New York. He also received $11,712.36 by way of interest and profits on investments of the guardianship funds. Anticipating the receipt of these funds from his children's kinfolk, Mr. Deming was, during the year 1922, appointed ancillary guardian by the court of appropriate jurisdiction in the state of New York.

In view of the receipt of this property, an order was entered in the superior court for King county requiring Mr. Deming to file an additional bond in the sum of

five thousand dollars, but before this was filed, it having appeared that a bond in such an amount would be insufficient, another order was entered requiring a bond in the sum of one hundred thousand dollars, and a bond in that amount was furnished by the United States Fidelity and Guaranty Company, which was filed March 18, 1922. May 11, 1922, upon petition of the guardian, the court directed that the five hundred dollar bond be cancelled, and upon the hearing before the superior court it was evidently assumed that the five thousand dollar bond never became effective.

Mr. Deming never filed a formal inventory of his wards' property, but did file several petitions which showed that he had received, belonging to his wards, money in various amounts. March 1, 1922, he filed what he called his first annual report, which was approved May 4th following.

During the early years of the guardianship, Judge Dykeman was presiding over the probate department of the superior court for King county, and March 27, 1924, signed an order reducing the one hundred thousand dollar bond to one thousand dollars; the order providing that the securities belonging to the guardianship be deposited with the Union National Bank, to be withdrawn only on court order. No new bond was filed, but the surety on the one hundred thousand dollar bond thereafter charged premiums only on the basis of a bond in the sum of one thousand dollars.

Prior to his wife's death, Mr. Deming had worked as an electrical engineer and as manager of a rubber company. His wife's illness and death and his own illness left him in debt, and he never thereafter, apparently, earned more than a living for himself. The children's money was treated as one estate, their living expenses and Robertson's schooling being paid as deemed necessary. Mr. Deming employed a house-

keeper to care for the two younger children and the home, he living with them except when he was absent on business. During the month of July, 1924, Mr. Deming remarried, the marriage being terminated by divorce during the year 1927.

After the resignation of Judge Dykeman as judge of the superior court, Honorable Everett Smith presided over the probate department, and guardianship proceedings were conducted before him. March 13, 1931, Judge Smith removed Mr. Deming as guardian, and March 17th appointed the Seattle Trust Company in his place, fixing the guardian's bond in the sum of one thousand dollars, which was furnished, with the United States Fidelity and Guaranty Company as surety.

Mr. Deming filed no account until September 4, 1931, when he signed one prepared by D. M. Lovgren, an accountant. No hearing was had upon this account until the trial which resulted in the decree now before us for review. September 18, 1931, Seattle Trust Company filed its guardian's inventory, and February 25, 1932, Judge Smith signed an order requiring Mr. Deming and his surety to pay one thousand dollars, the amount which the court apparently believed represented the amount of the bond upon which Mr. Deming's surety was responsible. The surety promptly paid this one thousand dollars, and an order was entered March 25, 1932, releasing the surety from further liability. Judge Dykeman died September 9, 1931, and Judge Smith died November 20, 1933; Judge Dykeman having ceased to occupy his judicial position several years prior to his death.

Robertson Deming became of age July 15, 1935, and retained counsel, who filed exceptions to the reports of Seattle Trust Company, as guardian, and Mr. Deming was cited into court, both by Robertson and the guardian. Earl G. Rice, Esquire, was appointed

guardian *ad litem* for Pierson and Helen, and a hearing was had in an endeavor to settle the guardianship accounts.

■ In effect, the action was an equitable accounting for the purpose of determining the rights of all parties concerned.

"Proceedings for settlement of a guardian's accounts are special proceedings in the nature of proceedings in rem. They are not actions at law, nor 'suits' in equity, although they are equitable in their nature, and the probate courts generally adopt the equitable forms of procedure, and dispose of the case on equitable principles." 28 C. J., Title, Guardian and Ward, 1213, § 372.

In 3 Pomeroy's Equity Jurisprudence (4th ed.), § 1097, the rule is laid down that equity has a general jurisdiction in guardianship proceedings

". . . to compel a performance of the trust duties, to relieve against violations of these trust obligations, to direct an accounting and final settlement of the *quasi* trust, and to grant other special relief made requisite by the circumstances."

Mr. Deming's accounts were in an extremely unsatisfactory condition. The accountant, Mr. Lovgren, who worked over them, as the trial court said, "did the best he could to make order out of confusion," but the guardianship was in such a state, as to many items, that it was impossible to determine just what had happened. It appeared beyond question that Mr. Deming had appropriated considerable amounts of his children's money to his own use, had grossly violated his obligation as their guardian, and had been guilty of many derelictions of duty. Pleadings were regularly made up presenting several issues which will be hereinafter discussed.

The court entered a decree adopting as a correct statement of Mr. Deming's accounts as guardian a report prepared by Mr. Lovgren, assisted by Mr. Rice,

the guardian *ad litem* of the two younger children, charging the guardian with a total amount of cash received in the sum of $71,270.83, of which the three children were owners in equal shares. The court allowed Mr. Deming credits in the total amount of $25,992.61, leaving a "net judgment liability" against him in the amount of $45,278.22. The decree charged Mr. Deming with six per cent interest in the amount of $30,087.95, and assessed against him damages in the amount of $7,127.08, being ten per cent of the entire corpus of the guardianship estate, rendering against Mr. Deming and his surety judgment in the sum of $82,493.25. Of this, Robertson was awarded judgment for the sum of $27,195.07, Pierson for $27,671.58, and Helen for $27,626.60.

By order dated November 23, 1922, the court had allowed the guardian, as compensation for Messrs. Cole and Dolby, attorneys, the sum of two thousand dollars. In the decree above referred to, the trial court allowed five hundred dollars of this amount, and disallowed fifteen hundred dollars thereof, surcharging the guardian with the fifteen hundred dollars as of the date of the allowance. By order dated July 12, 1932, the court had allowed the further sum of two thousand dollars for compensation for the guardian's attorneys. This allowance the trial court, by its decree, approved. Allowances on other accounts were made with which we are not here concerned. The trial court also audited the accounts of Seattle Trust and Savings Bank and allowed that guardian compensation for itself and its counsel.

From this decree, the United States Fidelity and Guaranty Company, the surety upon Mr. Deming's bond, has appealed to this court.

After the entry of the decree, Robertson P. Deming accepted a settlement, satisfactory to himself, and the

judgment in his favor has been satisfied, leaving only the judgments in favor of the two minors.

Appellant makes thirty-six assignments of error. These will be discussed in the course of the opinion.

■ At the outset, appellant argues that respondents, having taken no cross-appeal, are bound by the terms of the decree, and cannot avail themselves even of a manifest error therein contained, no matter how prejudicial to themselves. This argument is not sound. This court may notice and correct any evident error prejudicial to the minor respondents, even though they have not appealed. In the case of *Glade Coal Mining Co. v. Harris*, 65 W. Va. 152, 63 S. E. 873, the court of appeals of West Virginia laid down the rule as follows:

" . . . on appeal an infant will be given the benefit of every defense of which he could have availed himself, or which might have been interposed for him in the trial court; and that where the record shows error, as to a minor defendant, the judgment will be reversed, though there is no appeal on his part, it being the duty of the chancellor, as the guardian of infants, to protect their rights."

This doctrine is also supported by the following authorities: *Title Guaranty & Surety Co. v. Foster*, 84 Okla. 291, 203 Pac. 231; *Kempner v. Dooley*, 60 Ark. 526, 31 S. W. 145; *Parken v. Safford*, 48 Fla. 290, 37 So. 567.

■ Appellant's first assignment of error reads as follows:

"The court erred in denying the appellant surety a fair trial particularly by reason of the trial court's prejudice."

In arguing this assignment, appellant disclaims all intention of attacking the integrity of the trial judge, but contends that his judgment was biased in favor of the wards because of his sympathy for them. At the time of the hearing, the minors' estate possessed

practically no money, and their condition naturally would arouse a considerable degree of sympathy, as instead of lacking money, they should have been possessed of ample funds for their support and education. Appellant does not criticize the trial judge for sympathizing with the children, but contends that, because of this sentiment, appellant was not accorded a fair and impartial trial.

Appellant also contends that, in an endeavor to avoid criticizing the acts of the judges who had presided over different hearings in the course of the guardianship and signed certain orders in connection therewith, the rulings of the trial court resulted in unjust prejudice to appellant. Appellant was relying upon the orders entered by the judges before whom the guardianship had been conducted, and, in so far as these orders were upheld, appellant would be benefited, not prejudiced. Respondents have consented that all offers of proof may be considered as evidence in the case, if this court is of the opinion that the offer of proof was improperly rejected. Our attention is called to comparatively few questions in which testimony offered by appellant was rejected on respondents' objection, in which no offer of proof was made. Appellant devotes eighty-six pages of its brief to argument in support of this assignment of error.

The hearing, as above stated, was unusually long. Lengthy and complicated accounts were necessarily considered. The trial was participated in by the first guardian, by two of his sureties, by the second guardian, by Robertson and his counsel, and by the guardian *ad litem*. Able and energetic counsel were vigorously endeavoring to advance the conflicting interests of their respective clients. Considerable tension developed, and at times the strain upon court and counsel manifested itself by way of tart joinder and

rejoinder. However, the record affords no basis for holding that, because of any bias or prejudice on the part of the trial court, appellant did not have a fair trial, and that consequently this court should direct that a new trial be granted and the entire matter heard over again. Appellant's first assignment of error is without merit.

In arguing its next assignment of error, contending that the trial court erred in setting aside interlocutory orders previously entered in the guardianship proceeding and in charging Deming and appellant with sums expended under such orders, appellant advances certain legal propositions, which we shall now discuss.

In the first place, appellant contends that a guardian is required only to exercise good faith and ordinary diligence, and that he is not a guarantor or insurer of his ward's estate, nor liable for mere errors of judgment. In support of this proposition, appellant cites many authorities, with which, in the main, we are in accord. It does not appear that the trial court held Mr. Deming to any rule of conduct more strict than that stated by appellant.

It is next contended that an order of a probate court entered during the pendency of a guardianship proceeding is *prima facie* correct and provident, and that the burden rests upon the ward to successfully impeach any such order which is attacked. In this connection, appellant admits that an *ex parte* probate order may be reviewed on final settlement. *In re Gardella,* 152 Wash. 250, 277 Pac. 846; *In re Rohne,* 157 Wash. 62, 288 Pac. 269; *In re Carlson,* 162 Wash. 20, 297 Pac. 764. This question was considered in the case of *Mathieu v. United States Fidelity & Guaranty Co.,* 158 Wash. 396, 290 Pac. 1003, in which attention was called to the fact that, in proceedings which lead up to the entry of an *ex parte* probate order, the ward is not

represented; and that, as the proceeding is technically adverse to the ward, he is entitled to his day in court, which he has only when he has become of age, or, if the guardianship was instituted because of his insanity, when he has regained his reason, or until he is represented by a guardian *ad litem.*

As was said in the case of *Coleman v. Crawford,* 140 Wash. 117, 248 Pac. 386, where minors are concerned in proceedings pending before a court, the minor is represented not only by a guardian, but also by the court itself. It is also true that it is presumed that courts and other public officers act within the limits of their authority and in good faith. The question now under discussion has never been directly passed on by this court, but, after careful consideration, we are of the opinion that, generally speaking, an *ex parte* order of the superior court entered in a probate proceeding should be considered as *prima facie* correct and valid. The supreme court of Indiana, in the case of *Fidelity & Casualty Co. v. State ex rel. Anderson,* 98 Ind. App. 485, 184 N. E. 916, correctly stated the rule as follows:

"*Ex parte* orders, current reports, and other proceedings passed upon by the court during the pendency of the trust are *prima facie* correct, but remain within the control of the court, so that before final settlement and discharge of the guardian, they may be set aside, modified, or corrected, if the requirements of justice demand such action."

In this connection, as to when such order should be set aside, the rule was laid down in *In re Rohne, supra,* as follows:

"When, upon passing upon a guardian's final account, it appears that the acts of the guardian, even though approved by the court, have resulted in injustice to the ward, it is the duty of the court to scrutinize the account carefully and to disallow expenditures, even though the same were allowed by the court having immediate jurisdiction of the proceeding, if it appears

that the same were improvidently approved and were manifestly in derogation of the rights of the ward, and of such a nature as to amount in law to the exercise of bad faith on the part of the guardian."

Appellant contends that the order entered by the superior court reducing the bond upon which appellant is surety from one hundred thousand dollars to one thousand dollars, was a valid order, and that, because the superior court later demanded of appellant payment of the principal of the supposed one thousand dollar bond, which amount appellant paid to the successor as guardian, no further liability against appellant can be established.

It will be remembered that, by order dated March 27, 1924, after the guardian had received approximately fifty thousand dollars belonging to his wards, and had invested, under order of the court, over thirty thousand dollars in good securities, the court signed an order reducing the guardian's bond from one hundred thousand dollars to one thousand dollars, the order reciting that the estate would be amply protected by placing the securities in some national bank, to be withdrawn only on order of the court. No new bond in the sum of one thousand dollars was ever given, but the court, the guardian, the latter's counsel, and the surety, thereafter treated the one hundred thousand dollar bond as though it was in effect for one thousand dollars only.

Some testimony was introduced to the effect that the order reducing the bond was entered upon Judge Dykeman's suggestion and pursuant to plans formulated by him. Examination of the record convinces us that Judge Dykeman could not have understood the true situation, and that the order reducing the bond was made in plain violation of the statutory provisions applicable to guardianships, and was extremely im-

provident, considered from the standpoint of the facts of the case. The statute, Rem. Rev. Stat., §§ 1437 and 1574 [P. C. §§ 9953, 9906], provides that, upon a "proper showing," such a bond as that here in question may be reduced.

No proper showing was or could have been made on the facts justifying the reduction of the bond in the instant case, and the minors were not represented by any guardian *ad litem.* More money belonging to the minors was to come from the east to the local guardian, and a bond in the sum of one thousand dollars was manifestly hopelessly inadequate. Mr. Deming had been appointed ancillary guardian in the court of appropriate jurisdiction in New York, and the statutes of that state required that a bond for twice the value of the personal property, and of the rents and profits of any real estate, must be given by the guardian before the New York court would authorize the removal of money belonging to the minors from the state of New York.

The one hundred thousand dollar bond had become operative, and the rights of the minors had become fixed thereunder. The order reducing the amount was entered *ex parte,* and the wards, until the trial now before us for review, did not have their day in court as to the validity of this order.

Statutory proceedings providing for the reduction of such a bond as this must, in an attempt to reduce the amount of the bond, be strictly followed.

In the case of *Title Guaranty & Surety Co. v. Foster,* 84 Okla. 291, 203 Pac. 231, the supreme court of Oklahoma held void an order of the county court releasing sureties on a guardian's bond. In the course of its syllabus, the court used the following language:

"The order of the county court releasing sureties on the $35,000 guardian bond and accepting in lieu thereof a $1,000 bond, coupled with the order that the guardian

shall not use or in any wise control any of the moneys, funds, or other property belonging to the ward, except upon the authority of the court expressly given, and ordering all funds of the estate to be deposited in a certain bank, with directions that none of the funds so deposited shall be paid out except upon express order of the court, is void, because the court has no jurisdiction to substitute the bank and itself for the guardian bond required by the statute."

The case of *Commonwealth v. American Bonding Co.*, 245 Pa. 535, 91 Atl. 938, is analogous to the situation here presented. Upon application of the guardian, and without the ward's consent, a guardian's bond for twenty-five thousand dollars was reduced to four thousand dollars. On final accounting, it was held that the surety was still liable upon the bond as originally given.

The following authorities are to the same effect: *Rice v. Wilson*, 129 Mich. 520, 89 N. W. 336; *Aetna Acc. & Liability Co. v. Langley*, 68 Okla. 283, 174 Pac. 1046; *In re Sroufe's Estate*, 74 Wash. 639, 134 Pac. 471; 1 Schouler Domestic Relations (6th ed.), § 978.

Appellant argues that the court's power to reduce a guardian's bond was impliedly read into the bond and became part of the surety's contract. This is true; but in proceedings leading up to the reduction of a bond already operative, and in connection with which obligations have accrued, the law must be carefully observed before the amount of the penalty may be reduced.

Appellant also argues that, because the statute contains no direct provision for notice to a ward of a proposed reduction in the guardian's bond, notice of such a step is no more necessary than notice to the ward of the fixing of the amount of the bond in the first instance. Appellant's counsel state that a ward cannot complain if the court, in fixing the amount of the bond to be filed by the guardian, should, through mistake of

fact, fix it too low, and because of such mistake the ward thereafter suffer loss.

Doubtless, in such a case, the ward's complaint could not be so directed as to produce a remedy, as the error would be that of the court, a public officer who erred in discharging his official duty. *Peelle v. State ex rel. Hipes,* 118 Ind. 512, 21 N. E. 288. Neither the court nor the judge is responsible to a litigant injured by such a judicial error. When, however, a guardian's bond has once been filed and become effective, an entirely different question is presented. Rights and obligations have then arisen between the parties to the pending proceeding, and such obligations may be established, altered, or satisfied, only in the legal manner. The rule that probate proceedings partake of the nature of proceedings *in rem* does not apply to such a situation. It is difficult to imagine a more improvident order than that reducing the amount of the bond in the instant case. The order could not and cannot be justified on either the facts or the law.

Appellant cites many authorities in support of its contention on this phase of the case, but we are convinced that the trial court correctly held that appellant's bond in the sum of one hundred thousand dollars was still effective, and that appellant was and is liable thereon up to the full penalty thereof.

The trial court allowed appellant the premiums which it would have received had the one hundred thousand dollar bond been recognized at all times as effective, up to and including the year 1930. Mr. Deming was removed as guardian during the month of February, 1931, and for this reason, bond premiums after 1930 were not allowed. After Mr. Deming's removal, the only liability on the bond was on account of his acts prior to his removal. A new bond was filed by the succeeding guardian. Appellant has received compensation for the years during which its bond pro-

tected the wards against the wrongful acts of appellant's principal. Appellant is entitled to no more than this.

■ ■ Mr. Deming was removed as guardian *ex parte* by Judge Smith, February 2, 1931. Seattle Trust and Savings Bank (herein referred to as Seattle Trust Company) was appointed guardian March 17th following. The evidence strongly indicates that Mr. Graves, representing the trust company, was aware, at least after examining the Lovgren account filed September 4, 1931, of the fact that Mr. Deming was probably short in his guardianship accounts in a sum exceeding one thousand dollars.

January 11, 1932, Judge Smith wrote appellant, stating that it might become necessary to collect from appellant the amount of Mr. Deming's bond. March 7, 1932, Mr. Dolby, after consulting with Judge Smith, wrote appellant, stating that an order had been prepared providing for appellant's release of liability upon payment of the sum of one thousand dollars; Judge Smith and Mr. Dolby at this time being of the opinion that appellant's liability was limited to that amount. Mr. Graves, representing the then guardian, was advised of these proceedings. March 24, 1932, appellant's check for one thousand dollars, payable to the order of Seattle Trust Company, as guardian, containing the statement, "In full payment of account stated below," was delivered to the trust company, and after consultation with Mr. Dolby, was accepted and cashed. A petition dated March 25, 1932, verified by Mr. Graves on behalf of the guardian, stating the fact of the payment, was filed, and on the same day an order was entered by the court, reciting the payment, and that appellant was "released and discharged from any and all obligation or liability on said bond, and said bond is hereby released, satisfied and discharged."

At the time Mr. Deming was removed by the court's *ex parte* order, he was indebted to his wards in amounts vastly exceeding one thousand dollars, whether by way of direct misappropriation of money, or because of liabilities incurred, as determined by the trial court in its decree. Appellant contends that the order last referred to operated to release it from all liability on this bond. Some question was raised about the allowance of some trial amendment alleging release, asked for by appellant, and for the purposes of this opinion we will assume that all trial amendments asked for were allowed.

Appellant argues that the order upon which it relies was the result of negotiations between Judge Smith, Mr. Dolby, and Seattle Trust Company, as guardian, on the one hand, and appellant on the other; that these negotiations included an offer to settle all possible liabilities on the part of respondents for one thousand dollars; that this offer was accepted, and one thousand dollars paid; and that this payment should be held to have been made in full satisfaction of appellant's liability. Appellant strenuously contends that it was the duty of the trust company to settle the accounts with the former guardian, and that its acceptance of the one thousand dollars, under the circumstances shown by the record, bound the minors and resulted in the release of appellant.

Recovery upon guardianship bonds is not limited to the first liability established; but, as provided by Rem. Rev. Stat., § 1443 [P. C. § 9959], recoveries may be made upon the bond from time to time until the whole penalty thereof is exhausted. The trial court set aside the order releasing appellant in consideration of the payment of one thousand dollars, allowing appellant, of course, credit for the payment made. This was all that appellant was entitled to. Neither the recital in

the check that it was "in full payment," nor the order accepting the same, nor any facts disclosed by the record, operated to release appellant from liabilities which had already accrued, as the same might thereafter be lawfully established.

Assuming, as contended by appellant, that a guardian may, with the court's approval, settle and compromise claims existing in favor of his ward, the record does not show that any such rule here operates in appellant's favor. The record clearly indicates that the payment of the one thousand dollars was not a compromise or a settlement of anything. The negotiations were conducted and the payment made upon the assumption of fact that appellant was liable merely upon a one thousand dollar bond. The guardian's accounts were not settled, and no attempt was made to determine the amount of his indebtedness to his wards. The trial court properly held that appellant was responsible upon a bond in the sum of one hundred thousand dollars. The general rule is as stated in 28 C. J. 1300, § 506, that

"The probate court has no inherent power to discharge the bond of a guardian and release the sureties from liability upon terms other than a compliance with the conditions thereto; its power in the premises is limited to such as is conferred by statute."

Certain vested rights against their guardian and his surety had accrued in favor of the wards. No rights could be released by any such state of facts as here appears.

In the case of *Clark v. American Surety Co.*, 171 Ill. 235, 49 N. E. 481, the supreme court of Illinois considered questions somewhat analogous to those now under discussion. It appeared that an administrator was appointed for the estate of one Unger, and a bond filed and approved. Thereafter, by order of the court, the surety upon the bond was released and a new bond

filed. At the time this order was presented, the administrator filed a verified report, which the court then found to be correct. Later, an interested party moved to set aside the orders and reinstate the bond. The trial court and court of appeals denied any relief, and on appeal to the supreme court the judgments were reversed and the cause remanded with directions to set the orders aside.

In the case of *Bookhart v. Younglove,* 207 Iowa 800, 218 N. W. 533, the supreme court of Iowa stated clearly the principle underlying the purpose of probate bonds. The court said:

"The object of a bond is security to those who are interested in the property settlement of the estate. The law requires the bond for their protection, and the parties interested acquire a vested interest in the bond, which cannot be divested *without their consent,* except in the manner prescribed by law. The bond signed by the surety company was executed in pursuance of the statutory requirements and in obedience to the order of the court.

"In the absence of statute, the court is without authority to discharge or release a surety, except with the consent of the parties interested."

The supreme court of Pennsylvania, in the case of *Commonwealth v. Rogers,* 53 Pa. St. 470, referring to an executor's bond, said:

"It is true the Orphans' Court was the instrument by which the bond was obtained. The executor gave it in order to avoid being dismissed from his trust, and it was approved by the court. But when that was done, the power of the court over it ceased. It is not, as was thought by the court below, implied in the power to compel an executor to give a bond, that the court can release it after it has been given. The parties in interest may, but without their consent, the obligors cannot be discharged by anything less than compliance with its conditions. It was a serious mistake of the court below to treat such a bond as only a guaranty to

the Orphans' Court. It is as much a security to the legatees as is a recognisance in partition to secure to an heir his share of the valuation money a security to that heir. The court misapprehended, therefore, the power of the Orphans' Court over the bond given by Sloan and Rogers."

Later on in its opinion, the court, referring to the order releasing the bond, said:

"A decree of the court annihilating his rights, made without notice to him, must be regarded as simply void. And this, even if the court had possessed the power to release the bond after due notice."

The authorities we cite in this connection are, of course, not directly in point, but support our holding that appellant's contention that the release order operated to free it from further obligation is not well founded.

■ Before discussing rulings of the trial court on claimed guardianship credits, it should be noted that appellant contends that the trial court erred in refusing to consider evidence concerning conversations between Mr. Deming and his counsel, on the one hand, and Judges Dykeman and Smith, on the other, and in refusing to consider evidence to the effect that, prior to the entry of several orders in the guardianship proceedings, witnesses were sworn and testified, when the clerk's record merely shows the entry of an order. The evidence as to conversations with the judges, of course, tended to prove that the latter were familiar with the guardianship proceedings, and to some extent indicated the court's views as to the general course which the guardianship should take.

Certainly, in such a proceeding as this, in which the guardian is sought to be charged with thousands of dollars, the evidence clearly showing that he is indebted to his wards, testimony introduced on his behalf and on that of his surety as to conversations with

judges who had died prior to the trial would have little weight. It is also true, in the case at bar, that Mr. Deming's testimony showed that little reliance could be placed thereon. He certainly stood before the trial court, and stands before this court, a discredited witness. Much of the testimony above referred to is in the record, and assuming without deciding that it was competent, we find nothing therein which requires any result other than that which we reach in disposing of this case.

The same is true as to evidence sought to be introduced for the purpose of showing that witnesses were sworn on certain occasions, when the clerk's record is silent on that point. It appears from the evidence that the fact that a deputy clerk on duty in the superior court made an entry showing merely that, on such a date, an order in a probate proceeding was signed, does not necessarily indicate that no witnesses were sworn. A proper record should show that witnesses were sworn, and their names; but it appears that such complete records were not always kept.

Evidence as to what actually took place at such probate hearings may, on the one hand, bear the stamp of truth, or, on the other hand, be entitled to scant consideration. Such matters, however, go to the weight to be given such evidence, not to its admissibility. Appellant seems to argue that the trial court may have been influenced in its determination on the merits by the fact that certain records of hearings contain no notation as to the swearing of witnesses. Whatever the views of the trial court on this subject may have been, the record on that point contains nothing which requires reversal of the decree appealed from or any modification thereof other than such as we herein direct.

We shall now consider certain of appellant's assign-

ments of error which present for review rulings of the trial court disallowing expenditures made by the guardian, and charging different items to the guardian and appellant.

The first question presented is that concerning what may be referred to as the Seattle home of the Deming family. About 1917, the Demings rented from a Miss Larrabee, for forty dollars a month, a house known as No. 4603 First avenue northeast. Later, the rent was raised to forty-five dollars a month, which it appears was a rather low rental, considering the value of similar premises in Seattle. The house contained nine rooms and a bath, and during the year 1919 the Demings, by written contract, agreed to purchase the premises for $6,500, agreeing also to buy the furniture for $1,400. Five hundred dollars cash was paid on the contract, which was never filed for record and was not introduced in evidence at the trial, as it could not be found. As long as Mrs. Deming lived, forty-five dollars a month was paid on the contract, and Miss Larrabee testified that some payments were made after Mrs. Deming's death. After the signing of the contract, Mr. Deming built a new concrete garage and driveway on the property, constructed a retaining wall, and had the roof repaired; all, of course, at his own expense.

Mr. Deming, having suffered a greatly diminished income, by May, 1922, was far behind in payments due under the contract, and both he and Miss Larrabee testified that Mr. Deming offered to surrender the property to her. At this time, he was employed as a salesman, on commission, for the United States Rubber Company, earning very little over his .expenses. The children had to have a home, and Mr. Deming had no place to keep them. Prior to this date, the children had received $26,000 from the estates of their eastern relatives. It was known that they would receive more,

and, in fact, they did receive almost $20,000 in July, 1922. The house was well built and in the spring of 1922 was in a good state of repair.

May 11, 1922, the court entered an order, signed by Judge Dykeman, authorizing the expenditure of $6,500 of the children's money in the purchase of the house. Miss Larrabee executed a warranty deed running to Clarence B. Deming, as guardian. The purchase price was paid out as follows: $2,173.50, balance due on mortgage; $3,630.76, to Miss Larrabee; $137.62, accrued realty taxes; and $568.13, to Mr. Deming, apparently for his supposed equity in the property.

Much testimony was received concerning this transaction, and the court disallowed the purchase, charging the full amount to the guardian and the surety, and directing, of course, that the house be turned over to the surety. After the purchase, from time to time money was expended in repairing the house and paying insurance, taxes and assessments thereon, all of which payments were by the trial court charged to the guardian. Voluminous testimony was taken concerning this phase of the case, the guardian introducing evidence to show that Judge Dykeman fully understood the matter and directed the purchase with full knowledge of all the circumstances. Much of this latter testimony was objected to by respondents. Our view of this transaction renders detailed discussion of the evidence and questions raised on the admission thereof unnecessary.

The house was the home of the family. We are convinced that the price of $6,500 represented the reasonable value of the property. The children had to live somewhere, and the evidence clearly indicates that Mr. Deming was unable to provide even reasonably comfortable quarters for his family. The situation was unfortunate, but something had to be done. It is true,

as we said in *In re Rohne, supra,* that occasions would seldom arise in which a home for minor children should be purchased with their own money, but in view of the facts, we cannot say that the court, acting through Judge Dykeman, erred in holding that the problem which was presented by the situation of the Deming family should be solved by buying for the children with their money the house in which they were and had been living.

The home was not an extravagant one, the cost was not in excess of the value, and no reason existed for believing that the property would depreciate. It is hard to say what other satisfactory arrangement could have been made which would have resulted in any substantial saving to the children's estates. Mr. Deming should have supported his children, but the evidence indicates that at this time he was unable to do so, and whether or not he should have been earning more money than he was receiving, is immaterial. The record does not show that he was not doing his best to earn all he could.

We conclude that the trial court erred in setting aside the order directing that the home be purchased for the children. In this connection, however, it must be held that the court, in directing the purchase, should not have provided for the payment of more than was necessary to obtain a clear title to the premises. Mr. Deming should have received nothing; he should not have profited from the transaction; and the item which he appropriated is disallowed and will be charged to Mr. Deming and appellant. The approval of the purchase of this property of necessity carries with it the allowance of taxes, insurance, and necessary repairs thereafter paid on the property, and these items will be allowed as proper disbursements, and two-thirds thereof will be allowed against the minors' estates.

On remand, the superior court will determine, after taking further evidence, if it desires, the items to be allowed under this classification.

It appears that Mr. Deming paid some taxes against the Seattle property out of his own personal funds. He will not be allowed credit, as guardian, for such payment. He should, however, be credited for proper expenditures which he made out of guardianship funds, and for which he presents receipts, even though such receipts run to him, personally.

Appellant next contends that the trial court erred in disallowing an authorized expenditure of fourteen hundred dollars, which the guardian paid for furniture which was in the house which he had purchased. It seems that, at the time the Demings contracted to purchase the real estate from Miss Larrabee, they also, by contract of conditional sale, purchased from her the furniture which was in the house. The purchase price was fourteen hundred dollars, and by October 1, 1925, there was due to Miss Larrabee, on account of the purchase price of the furniture, principal and accrued interest, twenty-one hundred dollars. Miss Larrabee was demanding that something be done, and Mr. Deming being then unemployed and without means, it was suggested to the court that the furniture be purchased by the children for the original price of fourteen hundred dollars, which Miss Larrabee agreed to accept in full therefor.

October 25, 1925, Honorable A. W. Frater, then a judge of the superior court for King county, signed an order authorizing the guardian to purchase the furniture for the amount above referred to, and shortly thereafter the money was paid to Miss Larrabee, and a bill of sale from her received. This furniture had been in the house ever since it was occupied by the Demings, but when in August, 1919, they agreed to pur-

chase it for fourteen hundred dollars, they must have considered it then worth that amount. Some of the expendable items had been used up and replaced by others purchased by Mr. Deming. The trial court disallowed the purchase, and appellant contends that error was committed in this ruling.

At the time the court directed the payment, the children owned the house and, of course, needed furniture. It must be held, however, that the payment of the original price out of the children's funds was improvident. After six years use, the furniture had considerably deteriorated in value. We conclude that one-half this amount is properly chargeable against the minor's estate, and that up to this amount the expenditure was proper. Two-thirds of seven hundred dollars, and of subsequent expenditures by way of taxes, insurance and replacements, will be allowed against the minors' estates. An additional purchase of house furnishings in the amount of $228.90, made under court order, is allowed, and two-thirds of this amount will be charged to the minors.

It is appropriate to observe that several of the items which the guardian sought to charge against the estate of his wards fall within that twilight zone which exists between those items which constitute proper charges against the minors and those which clearly ought not to be allowed. The problems which arise in connection with the guardianships of wealthy children of impecunious parents are often difficult of solution. In the case of *Des Moines Sav. Bank v. Krell,* 176 Iowa 437, 156 N. W. 858, the supreme court of Iowa considered such a problem. The court recognized the duties of parents to conserve the estates of their children, and also the duty of parents to themselves bear the ordinary burden and expenditures of their own families. The court said, however:

"It does not follow, by any means, that a child and its parent must be held to poverty and dangerous privation during the years of its minority in order to preserve intact a considerable estate of such child, when the best interests of such child require that a home be maintained for it by the parent."

The court concluded that the probate court had wisely exercised its discretion in directing that the children be maintained in a home with their mother, and that the necessary expenses of such a home "within reasonable limits" should be paid by the minors' estate.

This court, in *In re Rohne, supra,* recognized the same rule of reason, subject to the primary duty of parents to support their minor children. As long as advantage to the parent from the maintenance of a home at the children's expense is merely incidental, it may be approved, but, as we said in the case last cited, "when the advantage to the parent exceeds such incidental benefit, it becomes wrongful, and such as should not be approved by any court."

The fact that Mr. Deming continued to live with his children in the house which the children purchased was merely incidental benefit to him, but his appropriation out of the allowed purchase price of the money which was not required to complete the purchase was wrongful. So the fact that, in connection with the purchase of the furniture, Mr. Deming was relieved of a contract to purchase upon which he was legally responsible, and that he would continue to enjoy the use of the furniture while occupying the house, were not such advantages to him as would prevent the superior court from directing that the furniture be purchased, but the payment of what is manifestly an excessive price for used furniture was a wrongful appropriation of the children's money, which should not be allowed.

We shall next consider the purchase of the

tract of land at Edmonds. During the year 1929, Mr. Deming and the children (save as to Robertson when he was away at school) were occupying the Seattle home, which apparently was comfortable and satisfactory. The evidence indicates that, at this time, this property was well worth the amount paid for it, and could have been sold for at least that sum. Robertson had developed into a wayward boy, and had caused considerable trouble. He was in difficulty at school, and some of his activities had been called to the attention of Judge Smith, as juvenile judge. Mr. Deming testified that he and Judge Smith discussed the matter of Robertson's welfare several times during the fall of 1928. At this time, Mr. Deming was, in fact, short in his accounts, and had made no proper report concerning his trust.

Early in 1929, it was suggested that a tract of land, about an acre and a half in extent, lying some distance north of Seattle and near the town of Edmonds, be purchased for fifteen hundred dollars, and improved by the construction of a dwelling thereon, to be occupied by the family. Mr. Dolby testified that he objected to this project, but was instructed by Judge Smith to prepare a petition. In due time, an order was entered directing the purchase of the land and the construction of a house thereon. Mr. Deming testified that he and Judge Smith were of the opinion that it would be better for Robertson to live outside of a city environment, and that the boy's interest might be intrigued by the construction of a country place. Some bonds belonging to the guardianship were sold, and in the course of the construction of the house, others were pledged.

A simple statement of this project reveals its utter improvidence. The children owned and occupied a good home, and to purchase land and construct another

one was entirely unnecessary. Had Mr. Deming done his duty, handled his children's money honestly, kept proper accounts of the guardianship, and filed correct reports concerning the same, the court would have been correctly advised as to the children's affairs, and would have known how best to guard the children's interests. Instead of this, Mr. Deming had appropriated considerable sums of his children's money, had apparently kept no accounts to speak of, had filed no report, nor even an inventory.

The court below disallowed any expenditures in connection with the purchase of the Edmonds land and the construction of the house thereon, and we agree with the trial court that this entire project was so wildly improvident as to require such a ruling. Appellant argues that the purchase of the Edmonds property was ratified by the second guardian, and that thereby appellant stands relieved of liability on account thereof. We find no merit in this contention. Expenditures for this property being charged to the guardian, the court properly directed that the land, upon payment of the judgment, be turned over to the surety.

Appellant complains of the disallowance of one item, amounting to $240, in connection with the Edmonds property, concerning which appellant's contention is well taken. To raise money, apparently for the Edmonds project, Mr. Deming pledged certain bonds to one Stella M. Crollard. Evidently the bonds and other papers in connection with this transaction were placed in escrow, and while in this status, $240 interest was earned and paid, which sum apparently later came into the possession of the second guardian. The trial court treated the pledge of the securities as a conversion, and charged Mr. Deming and appellant with the market value of the bonds at the time of the pledge, and interest from that date.

Mr. Deming should not be charged with interest which was actually received by his successor, and that is apparently what happened here. This charge of interest will be reduced to the extent that the minors' estate received interest on the pledged bonds, and Mr. Deming and appellant relieved *pro tanto*.

As above stated, Mrs. Deming died February 28, 1920, leaving no property save her interest in a small community estate, which was deeply in debt. Mr. Deming was appointed executor of his wife's will, but, beyond publishing notice to creditors, did nothing. Mrs. Demings diamond ring and the family automobile remained in Mr. Deming's possession, and the children never received any portion of the value thereof. The trial court charged Mr. Deming and appellant with the sum of $1,118.75, representing one-half of the community estate, together with interest thereon from February 11, 1921. Appellant contends that Mr. Deming had the right to have three thousand dollars in value of the estate set over to him as surviving spouse, which would have left nothing in the estate, and that for this reason the guardian should not be charged with any portion thereof in favor of his children. Appellant contends that, in any event, no interest should be charged, as the amounts upon which the interest could be computed were unliquidated.

Very possibly, Mr. Deming, if he had followed permissible procedure, might have claimed three thousand dollars in lieu of homestead, but he did not do so, and as the record stood, he had appropriated property belonging to his children, as found by the trial court. While the value of the diamond ring and of the automobile had never been determined, such values were in no sense unliquidated. The values were to be fixed as of the date of conversion, and upon being determined

by the court, interest was properly allowed from the date the children were deprived of the property.

We shall now take up the very difficult and complicated matter of allowances for the support and maintenance of the children. The evidence convinces us that, after Mrs. Deming's death, Mr. Deming's earnings were insufficient to adequately provide for his family. It is impossible to determine just what he did earn, but notwithstanding the primary duty of a father to support his children, even though they are possessed of an ample estate, under the circumstances which existed, the court properly directed that some portion of the children's money be appropriated to their maintenance.

The guardian signed a petition asking for an allowance, and May 19, 1921, an order was entered, reciting that it appeared to the satisfaction of the court that the guardian had expended for the minors $275, and that such expenditures were "necessary, just and proper." February 28, 1922, the guardian filed what he called his first annual report, which included the expenditures aggregating $275 which had been allowed, and other expenditures up to the date of the report. This report was not in detail, but stated the expenditures for one month had amounted to $165.85, multiplied this by twelve, as an annual estimate, and added $100.50 for fuel. A hearing was had on this report, and May 4, 1922, an order was entered approving the same. This order in part reads as follows:

"Now THEREFORE IT IS HEREBY ORDERED, ADJUDGED and DECREED, that the first annual report of the above mentioned guardian of the receipts, expenditures and liabilities incurred by said guardian for and on behalf of the above mentioned minors be, and the same hereby is confirmed, approved and allowed, and that the estates of the said wards are owing to the said guardian for money expended by him and for obligations in-

curred by him for and on behalf of said minors, up to and including the 11th day of February, 1922, in the sum of Ten Hundred Ninety and 70/100 ($1090.70) Dollars, and that said guardian is hereby authorized to draw on any funds in his hands belonging to said minors to repay himself for money expended by him as aforesaid, and to pay any obligations incurred by him for and on behalf of said minors to the extent of Ten Hundred Ninety and 70/100 ($1090.70) Dollars, for the period from February 11th, 1921 up to and including February 11th, 1922.

"IT IS FURTHER ORDERED, ADJUDGED and DECREED that the said guardian be, and he hereby is authorized to expend the sum of Sixty-five ($65.00) Dollars per month each for the care, support, maintenance and clothing of said minors, Pierson P. Deming and Helen P. Deming, out of any funds coming into said guardian's hands, belonging to said minors."

On the trial below, Mr. Deming produced some vouchers, which he testified represented expenditures made and covered by his first report, all of which the court disallowed, save the payment of $315 to Mrs. Maloney, for seven months service as housekeeper. Apparently the court disallowed these expenditures for lack of proof that they were made.

We conclude that the trial court erred in disregarding Judge Dykeman's order approving the first account. Admitting that the evidence as it now appears is unsatisfactory, and admitting that the guardian was greatly at fault and subject to severe criticism for not filing proper vouchers at the time, we nevertheless are of the opinion that the order entered by Judge Dykeman should stand.

Blamable as Mr. Deming is, and bearing in mind that every reasonable doubt should be resolved against him, nevertheless no reason exists for failing to charge to the children so much of their money as was necessarily, providently, and actually expended for their support,

maintenance, and education; and we conclude that the record does not support the trial court's ruling setting aside the order of Judge Dykeman, above referred to, save as to the paragraph thereof providing that the guardian should expend sixty-five dollars per month on account of each of the two younger children. The guardian had filed no petition asking for a monthly allowance for each child, and it appears that the allowance made was awarded at the hearing at which Mr. Deming testified, upon the court's suggestion. We agree with the trial court that this portion of the order was improvidently entered and should be set aside.

The trial court allowed thirty dollars per month for each of the two younger children, from the date of Judge Dykeman's order to the date of the removal of the guardian. Of course, in considering the matter of the propriety of such an allowance, the question now is not what should have been considered as a reasonable allowance for the children, but what was actually and providently expended for them. Under no circumstances, should a credit be allowed the guardian greater than the expenditures of which the children directly received the benefit. The record upon this phase of the case is voluminous, and it is easy to become lost in a maze of unsatisfactory and inconclusive testimony, complicated by confused figures and accounts, from all of which some result must be reached, which will be, necessarily, a somewhat arbitrary figure. We conclude that the allowance made by the trial court was too small, and the same will be increased from thirty dollars a month to forty-five dollars a month for each of the two younger children, to be computed on the basis employed by the trial court.

During the year 1922, Messrs. Cole and Dolby, as attorneys for the guardian, were allowed and paid

two thousand dollars. Several years thereafter, the court, through Judge Everett Smith, allowed Messrs. Cole and Dolby, as the guardian's attorneys, a further fee of two thousand dollars, for services rendered from the date of the first allowance to 1931. The trial court disallowed fifteen hundred dollars of the first two thousand dollars allowance, and approved the second allowance, but charged the guardian with the fifteen hundred dollars disallowed from the first allowance, plus interest to the date of judgment.

We cannot hold that the trial court erred in revising the allowances to the guardian's counsel, but the two allowances should have been considered together, and the portion of the first fee disallowed taken from the second allowance. Under the circumstances, the guardian should not have been charged with interest upon the portion of the first fee disallowed. The remaining portion of this second allowance should be paid to the attorneys in the course of the administration of the guardianship, and the trial court erred in making the second allowance a lien upon the judgment. The portion of the decree dealing with the allowances to Mr. Deming's counsel will be modified as hereinabove set forth.

The trial court did not err in refusing to allow Mr. Deming any compensation as guardian.

We shall now consider the matter of the allowance of interest as presented by appellant's assignment of error No. 30. By its decree, the trial court allowed recovery by way of interest against the guardian and appellant in an amount exceeding thirty thousand dollars. Appellant argues that much of this interest allowance was wrongful, and that the interest charge should be reduced. Modifications of the decree in appellant's favor hereinabove provided for will con-

siderably reduce this item, but we are of the opinion that other reductions should be made.

Appellant was properly charged with interest on the share of the community estate which the children inherited from their mother. While the values of the automobile and diamond ring had not been definitely determined prior to the trial below, the two articles were known definitely and could be and were described, and the value determined. We hold, as above stated, that these claims were not unliquidated, as contended by appellant.

The guardian was properly charged with interest on all sums which he converted to his own use, or failed to account for, and upon the sum allowed to him by way of compensation for his services, the order of allowance having properly been vacated by reason of the guardian's shortages.

A more difficult question is presented by those items which the guardian expended pursuant to order of court, but which items were disallowed by the trial court and the disallowance affirmed by this court. It is the law that such interlocutory orders as were here entered are not conclusive, but may be set aside at a later and final hearing, at which all the parties are represented. Admitting that the orders may be set aside, and money expended thereunder charged to the guardian and his surety, because the orders were so illegal or improvident as to justify such action, nevertheless, in the absence of bad faith amounting to an intent to defraud, we are of the opinion that interest should not be allowed upon moneys so expended. It may well be argued that the amounts which the wards may recover by setting aside such orders are unliquidated until the order directing the repayment becomes effective.

In the case at bar, Judge Dykeman signed an order

permitting the expenditure of sixty-five dollars a month for each of the two younger children. The trial court allowed only thirty dollars a month for each child, and on review we increased the amount to be allowed to forty-five dollars. The sum for which the guardian is chargeable has never become fixed until the ruling of this court upon the matter becomes effective. It is also true that this is an equitable proceeding, and equitable principles should be taken into consideration.

We hold that, in so far as the guardian's accounts show the expenditure of moneys pursuant to order of the superior court, save as herein expressly provided, no interest shall be charged against the guardian upon sums so expended which he is required to return to his wards. The guardian, however, will be charged with interest upon that portion of the purchase price of the Seattle property which he appropriated in payment for his supposed equity. As to this transaction, the guardian is entitled to no consideration.

We find few authorities which are particularly helpful upon this phase of the case. The opinion *In re Von Polheim,* 175 App. Div. 819, 162 N. Y. Supp. 498, shows a somewhat analogous situation. There, an attorney had withheld funds collected for his client, claiming, apparently in good faith, a fee, the amount of which had never been agreed upon. The court, after directing the payment of a portion of the money to the client, held that no interest should be charged against the attorney. In the course of its opinion, the court said:

"The dispute between himself and his client was not primarily as to the value of his services, but as to whether he was entitled to anything at all. The amount of his fees, if he was entitled to them, was unliquidated, and the amount he claimed, which would have eaten up the entire fund, was not so unreasonable,

as the event proved, as to warrant a claim that he acted in bad faith in claiming what he did claim."

In the case cited, the amount which came into the attorney's hands was known, but the amount which he should recover, if any, and consequently the sum he should pay his client, had never been determined. So here, the amount expended by the guardian under orders of the court is and was at all times known, but whether all or only a portion of such money must be returned to the wards remained undetermined or unliquidated until fixed by the decree herein.

It has been held that, where an accounting is necessary in order to determine the amount due, the demand is unliquidated, and no interest may be recovered (*Bull v. Rich*, 92 Minn. 481, 100 N. W. 213, 101 N. W. 490; *Minton v. Mitchell*, 89 Cal. App. 361, 265 Pac. 271), and that the same rule should be followed in cases of mutual accounts, each of which is contested (*Palmer v. Stockwell*, 75 Mass. 237; *Davis v. Walker*, 18 Mich. 25; *Brewster v. State*, 170 Wash. 422, 16 P. (2d) 813).

The opinion of the supreme court of Pennsylvania, *In re Clauser's Estate*, 84 Pa. St. 51, is in point upon the question now under discussion. It appeared, among many other questions presented, that an executor had improperly paid one thousand dollars by way of counsel fees. Upon accounting, he was surcharged with the sum paid, but was not charged with interest on the money, although he was surcharged with interest on other items. As to the payment referred to, he was given the benefit of the presumption of good faith.

The control of the courts over the administration of trusts is the subject of many pages of volume 1, Restatement of the Law of Trusts. The text of § 207 is of interest in connection with this phase of the case at bar. The principle is laid down that,

"In determining the rate of interest with which the trustee is chargeable, the following circumstances may be relevant: (1) whether the breach of trust was committed in bad faith, was intentional although not committed in bad faith, was committed negligently or as a result of a mistake in the interpretation of the trust instrument; (2) whether the breach of trust consisted in action by the trustee or in his failure to act."

It is considered that, in determining the matter of the payment of interest by a trustee, the court, under certain circumstances, may fix a rate less than the legal rate. This recognizes the equitable principle which should govern in the case at bar, and supports our conclusion that distinctions should be drawn between the different items which are herein chargeable to the guardian and his surety.

The trial court assessed a penalty against Mr. Deming and appellant in an amount equal to ten per cent of $71,270.83, being the total value of the assets for which the court held Mr. Deming should account. The trial court was of the opinion that levy of this penalty was required by Rem. Rev. Stat., § 1575 [P. C. § 9907], subd. 3, which section sets forth the duty of guardians, subd. 3 thereof reading as follows:

"(3) To render on oath to the proper court an account of his receipts and of his expenditures, with vouchers therefor, at least once in every two years, and whenever cited to do so, and failing so to do, he shall receive no allowances for services, and be liable to said ward on his bond in damages for ten per cent of the whole amount of the estate, both real and personal in his hands belonging to such ward."

Appellant assigns error upon the imposition of this penalty.

The legislature of Washington, at its second session, passed "An Act touching the relation of guardian and ward" (p. 14, Acts of the Legislative Assembly of the

Territory of Washington, Olympia, 1855). This act provides for the appointment by the probate court of guardians for minors, and appears to have been copied from a similar act enacted by the legislature of the state of Indiana in 1852 (2 Rev. Stat. of Indiana, Indianapolis, 1852, p. 321). The section of our statute above referred to is a verbatim copy of subd. 3, § 9, of the Indiana act (p. 324). Section 13 of the Indiana statute (p. 325) provides that

"Any bond given by any guardian, may be put in suit by any person entitled to the estate; and such suit shall be governed by the law regulating suits on the bonds of executors and administrators;"

which section was also copied verbatim in the act of our territorial legislature above referred to, and is still in force.

Rem. Rev. Stat., § 1575, subd. 3, *supra,* makes it the duty of a guardian to file a verified account, with vouchers, "at least once in every two years, and whenever cited to do so," upon penalty of receiving no allowance for his services, and being liable "for ten per cent of the whole amount of" his ward's estate, both real and personal. Regarding this latter portion of the penalty, the act provides that the guardian "be liable to said ward on his bond in damages for ten per cent," etc. The act, then, contemplates some supposed damage suffered by the ward, for which the guardian should be liable. Subdivision 4, of § 1575, requires the guardian

"(4) At the expiration of his trust fully to account for and pay over to the proper person all the estate of said ward remaining in his hands."

It is clear that subd. 3, *supra,* does not refer to an accounting by the guardian in the sense that he must turn over to his ward the money or property which he received, or account for the same by proper voucher,

but refers merely to the filing of a verified written account, with vouchers for such expenditures as he may have made. The statute, then, fixes an arbitrary forfeiture or penalty for the breach by a guardian of a statutory duty, which may or may not result in damage to his ward's estate. A guardian may steal his ward's property; he may neglect his ward, thereby causing the ward to suffer serious physical injury; he may be guilty of other offenses against his ward; without incurring the penalty referred to, or any other imposed by the probate code, save, of course, that he is liable for the value of property stolen or negligently lost, with interest on the value thereof. The comparatively minor dereliction of failing to file a verified account within a two year period incurs a heavy penalty, regardless of whether or not the least damage has resulted to the ward's estate.

Our conclusion that subd. 3 refers merely to the failure to account is supported by the opinion of the supreme court of Indiana, in the case of *Baldridge v. State ex rel. Nicholson,* 69 Ind. 166. In the case cited, the guardian of a minor sued a former guardian and the sureties upon his bond, alleging a failure to file an inventory and the conversion of moneys. On appeal from a judgment in favor of the plaintiff, it was contended, *inter alia,* that the trial court had erred in directing the jury to allow ten per cent of the total amount which they found had been received by the former guardian, together with interest on such amount. In its opinion, referring to the act now under discussion, the supreme court said:

"It seems to us, that the language of this clause of the statute is free from doubt, uncertainty or ambiguity, that no technical word or words of two-fold import are used or found therein, and that its sense and meaning are so clear and plain as not to admit of construction. The duty of the guardian to render to the proper

court, at least biennially, a verified account of his receipts and expenditures, is declared and clearly expressed; and the penalty and liability of the guardian for his failure to perform this particular duty are set forth in terms of no doubtful meaning. For a breach of the duty enjoined upon a guardian, in this third clause of said section 9, it is clear that he would be liable on his bond to his ward, by the express letter of the statute, 'for ten per cent. in damages on the whole amount of estate, both real and personal, in his hands belonging to such ward'."

It appearing that the plaintiff had not alleged any failure to account, and that no such failure was proven on the trial, the court held that the statutory provision above referred to did not apply. In the course of its opinion, the court referred to another section of the Indiana statute, providing that, in suits on the bonds of executors and administrators, the measure of damages should be the value of the property not accounted for, any injury sustained, interest on money retained, such exemplary damages as might be awarded, and in addition, ten per cent of the entire amount assessed. The court held that, because of the statute above referred to, providing that suits on a guardian's bond should be governed by the law regulating suits on the bonds of executors and administrators, the remedy available in the case before the court was found in the Indiana statute last referred to. The court continued:

"On the other hand, the relator's counsel insists that, by reason of the fact that the rule of damages prescribed in the third clause of said section 9 is apparently limited, by the terms of said clause, to the single breach of the duty of a guardian mentioned therein, namely, to render to the proper court, at least biennially, his verified accounts of his receipts and expenditures as such guardian, it ought to be and must be assumed that the Legislature fully intended, in and by the enactment of said section 13, above quoted, of the act touching the relation of guardian and ward, to pro-

vide the same measure of damages in suits upon the bonds of guardians, for other breaches of duty than the comparatively trivial one specified in said third clause, as was provided in said section 163 of the decedents' estates' act, in suits upon the bonds of executors and administrators. It is urged by counsel with much force, that the construction of the statute, in accordance with the views of the appellants' attorneys, would necessarily involve the Legislature and the courts in the apparent absurdity of subjecting a guardian to heavy damages for his mere failure to render his verified accounts to the proper court as often as the statute directs; while, for the more grievous breaches of his duty, such as the embezzlement or conversion to his own use of his ward's estate, no damages whatever would or could be assessed against him. We are not inclined to adhere to such a construction of the statute as might possibly authorize such an argument or conclusion.

"It seems to us, that the rule of damages prescribed in the third clause of said section 9 is applicable only, in a suit upon a guardian's bond, to a breach of the particular duty of a guardian specifically mentioned in said clause; but that in such a suit, for any breach of any other duty of a guardian, the measure of the relator's damages is and must be, under and by force of said section 13 of the act touching the relation of guardian and ward, 'governed by the law regulating suits on the bonds of executors and administrators,' as the same is declared and set forth in said section 163 of the act providing for the settlement of decedents' estates."

The supreme court held that the trial court had not erred in directing the jury to assess damages in the amount of ten per cent, as such a recovery was warranted by the statute making executors and administrators liable for embezzlement and other derelictions of duty.

In the later cases of *Stroup v. State ex rel. Fitch,* 70 Ind. 495, and *Kinsey v. State ex rel. Shirk,* 71 Ind. 32, the doctrine of the *Baldridge* case was approved. In

the case of *Eiceman v. State ex rel. Leonard,* 75 Ind. 46, the supreme court adopted a commissioner's opinion affirming a judgment in favor of the ward against his guardian. The statute making a guardian liable for the ten per cent for failing to file accounts within the time limited by law was upheld on questions raised upon the pleadings. The opinion states that the statute is "too clear to require or admit of construction," that the duty imposed was reasonable, and that the statute should be enforced.

In the later case of *Peelle v. State ex rel. Hipes,* 118 Ind. 512, 21 N. E. 288, a suit upon a guardian's bond, the court states that the only breach relied on was the failure of the guardian to account to the ward when he became of age. The court, after citing the case of *Baldridge v. State ex rel. Nicholson, supra,* laid down the measure of damages, saying, *inter alia,*

"Under this rule it is not proper to compound the interest, but the true method is to compute simple interest, add it to the principal, and, should the court deem it proper in the particular case, add to this amount ten per centum. We incline to the opinion that the penalty of ten per centum prescribed is the exclusive one, but we do not now so decide. What we here decide is, that, as against the surety, and in such a case as this, the damages are to be assessed in the method we have indicated."

In the course of its opinion, the court said:

"It seems, therefore, that in such a case as this, where the guardian does not actually receive and appropriate interest, but simply keeps the money in his hands and refuses to pay it over to the ward when he becomes of age, the amount of the recovery is the principal, simple interest and the statutory penalty. We think, at all events, this rule, as in favor of a surety, is the one that should be applied to a case like this, where the sum received was comparatively small and was received in very small amounts, and where it does not appear that it could have been or was invested by

the guardian. Each case must depend, in a great degree, upon its particular circumstances and we do not undertake to lay down any general rule, but restrict our decision to the case as the record presents it.

"The courts are careful—and so they should be—to protect the interests of wards, but it is not to the interest of wards to impose heavy penalties upon sureties. If penalties are uncertain and severe, men of financial ability will be slow and reluctant to undertake as sureties for guardians. While the penalty should be heavy enough to fully reimburse the ward and to move the guardian to faithfully perform his duty, it should not be so severe as to punish sureties. It is not the object of the law to punish sureties, but to fairly compensate beneficiaries. A surety does not occupy the position of a guardian who has committed a wrong, although he is responsible for the loss occasioned by that wrong."

In the case last cited, the supreme court of Indiana apparently holds that the trial court may exercise its discretion in charging against the guardian a ten per cent penalty. The statute itself contains nothing to warrant such a construction, and the earlier opinions contain no suggestion that the act should be so construed.

The laws of Indiana are well balanced, a penalty being also provided in case a guardian converts his ward's property to his own use. Our legislature adopted the Indiana statute relating to guardians, but has failed to enact any legislation imposing a penalty upon a guardian whose accounts showed a shortage. The supreme court of Indiana, in its opinion in the *Baldridge* case, *supra*, referred to a breach by a guardian of his duty to file a verified report every two years as "comparatively trivial," and contrasts this dereliction with such grievous breaches of duty as embezzlement or conversion, and refers to liability to a penalty in the former case and not in the latter as an "ap-

parent absurdity." No such situation existed under the statutes of Indiana, but if the section of our law now under discussion is valid, exactly that absurd situation does exist here.

We agree with the Indiana court that the section of the statute is too plain for construction, and we find no basis therein for the exercise of judicial discretion in imposing or not imposing the statutory penalty, as may seem just. While the section is apparently based upon some theory of compensation for damages, it is certainly seldom that any damage to a ward would follow from a mere failure to file a verified report. The letter of the statute would apparently be satisfied by the rendering of an account, even though inaccurate, while the failure of an honest guardian, who may have labored faithfully and well in the interest of his ward, to file a correct account for a week, or even a day, beyond the statutory period, subjects him automatically to the penalty. A minor's estate may consist only of unimproved real estate, and his guardian may never receive a dollar in money, or that value in property, and yet should he fail to seasonably file his report, he will be responsible for the penalty, even though he has paid taxes on his ward's estate out of his own pocket. Many instances can be imagined which would produce such different and unequal results that the inequitable operation of the statute and its possible production of absurd results are evident.

Manifestly, the ten per cent is a penalty and not a compensation. *Brown v. Kildea*, 58 Wash. 184, 108 Pac. 452, 1135. Its imposition does not depend upon the existence of any damage whatsoever. A penalty may be so excessive as to amount to a deprivation of property without due process of law. *Southwestern Tel. & Tel. Co. v. Danaher*, 238 U. S. 482, 35 S. Ct. 886, 59 L. Ed. 1419, L. R. A. 1916A, 1208; *Superior Laundry*

*Co. v. Rose,* 193 Ind. 138, 137 N. E. 761, 139 N. E. 142, 26 A. L. R. 1392; *Stierle v. Rohmeyer,* 218 Wis. 149, 260 N. W. 647; 12 C. J. 1246-7, §§ 1031-2.

It is true that the law, as it stands, affords a court an opportunity to punish a guardian, who may have been slow in filing his accounts, for other derelictions of duty, but this is not an admirable theory, or one which either legislatures or courts should encourage. A default by a trustee should carry its own appropriate penalty, and a statute which may permit the imposition of deserved punishment in a case in which the law fails to provide any adequate penalty is not, for that reason, to be upheld, if, considered in connection with its clearly expressed purpose, it is obnoxious to certain well recognized legal principles. As we read the penalty statute in the light of the laws of Indiana and the decisions of the supreme court of that state, and in consideration of the fact that, in this jurisdiction, there is no statute providing a penalty to be visited upon a guardian in case of his misappropriation of his ward's property, we cannot but conclude that the statute in question makes mandatory so severe a penalty for what will often amount to no more than a trivial departure from a guardian's statutory duties, resulting in no damage to his ward, as to amount to deprivation of property without due process of law.

It is easy to imagine further instances which would clearly demonstrate the utterly illogical operation of the law and its failure to recognize any basis founded on damage sustained. Suppose three guardianships pending, owning, respectively, property valued at one thousand dollars, ten thousand dollars, and one hundred thousand dollars. Suppose, further, that each guardian fails to file a report within the time limited by law. In the one thousand dollar estate, the damage might be serious, and because of the delay, if it be con-

ceivable that such a result might follow, the entire estate was lost. While the guardian would be required to make good the loss, the penalty imposed would be only one hundred dollars. In the second estate, the guardian would be required to pay one thousand dollars, although the loss caused by his dilatoriness might be very slight; while in the third and largest estate, although it might clearly appear that no loss whatever had been occasioned by the guardian's delay, he would be required to pay ten thousand dollars.

Of course, in case of any loss, the guardian and his surety are responsible, and if they can be compelled to make good the loss, the ward is made whole, and no compensation by way of a penalty is required to reimburse the ward's estate. If neither the guardian nor the surety is financially responsible, the imposition of a penalty is a vain gesture.

Questions somewhat similar to that now under discussion have been presented to other courts. In the case of *Stierle v. Rohmeyer*, 218 Wis. 149, 260 N. W. 647, the supreme court of Wisconsin considered statutes prescribing the procedure to be followed in subjecting to the mortgage debt property covered by a chattel mortgage. One statute provided that notice of sale must be given to the owner of the equity of redemption; the other providing for the filing, within a specified time after the sale, with the registrar of deeds, of an affidavit reporting the sale, and containing specified facts relating thereto. Each section provided that, for violating any provision thereof, the owner of the equity might recover damages sustained through the violation, a penalty of twenty-five dollars, and that the debt secured by such mortgage should be deemed fully satisfied and the mortgage canceled. The court quoted from its opinion in the case of *State ex rel. Mil-*

*waukee Medical College v. Chittenden,* 127 Wis. 468, 107 N. W. 500:

"Due process of law does not mean merely according to the will of the legislature. . . . It means according to the law of the land, including the constitution with its guarantees and the legislative enactments and rules duly made by its authority, so far as they are consistent with constitutional limitations. It excludes all mere arbitrary dealings with persons or property."

The court, after quoting from many other authorities, held that the provision of the act, to the effect that the debt should be fully satisfied and the mortgage canceled, was unconstitutional and void as purporting "by legislative fiat to declare a debt paid that was not paid and to transfer one man's property to another."

In the case of *Edwards & Browne Coal Co. v. Sioux City,* 213 Iowa 1027, 240 N. W. 711, the supreme court of Iowa held that a city ordinance requiring that oil magazines be kept in a certain manner, under penalty of one hundred dollars fine, or thirty days imprisonment for each day's violation, was void as authorizing excessive fines and penalties.

The supreme court of Indiana, in the case of *Superior Laundry Co. v. Rose,* 193 Ind. 138, 137 N. E. 761, 139 N. E. 142, 26 A. L. R. 1392, considered a statute requiring an employer to make payment at least twice a month of all wages earned up to the time of payment, and imposing a penalty of ten per cent of the unpaid wages for each day they remained unpaid after they became due. In the course of its opinion, the court said:

"The penalty is not proportioned to the amount of wages withheld, but is without limit as to the time during which it shall continue to accumulate, or as to the total amount. This is not 'equal protection of the law,' nor does it afford the employer 'due process of

law,' but arbitrarily deprives him of property by threatening such dire consequences if he shall litigate a claim for wages and not be entirely successful that he may fear to refuse a demand, even though convinced that it is unfounded and unjust."

The court held that the penalties which might be assessed under the provisions of the statute might be, and in the case at bar were, excessive and oppressive; and that the statute, in so far as the imposition of the penalty was concerned, was unconstitutional.

Careful consideration of the statute now under discussion, in the light of the authorities, convinces us that the provision thereof purporting to impose a ten per cent penalty for failure to file a verified account within the time limited by law is arbitrary, unjust and discriminatory, is not based upon any reasonable theory of compensation, and that the same is consequently void as amounting to taking property without due process of law. We accordingly hold that that portion of the law purporting to impose a ten per cent penalty for failure to file a verified account within the time limited by law is void and of no effect.

Appellant contends that the guardian was allowed inadequate credits for the support, maintenance, and education of Robertson. As this young man settled with the guardian and appellant, in so far as his rights or those of his estate are concerned, this matter is immaterial. We are of the opinion, however, that the guardian should have been allowed a credit of forty-five dollars per month on account of Robertson's support and maintenance during the periods of time he was at home. This may make some difference as to the matter of interest in recasting the accounts, and on remand should be considered, if relevant, for that purpose.

Appellant contends that the trial court, to appellant's prejudice, failed to adjudicate certain rights of the

parties, *inter se.* In the first place, appellant seems to contend that the surety upon the first guardian's bond in the sum of five hundred dollars may assert against appellant some claim for contribution. We do not find in the record any support for appellant's argument that it is entitled to any relief on this score.

Appellant contends that the present guardian has received and is retaining certain interest which it collected on bonds which Mr. Deming pledged, and which were charged against him and appellant. If the present guardian of the minors has received and retains any interest on any pledged bonds, which interest accrued after the date of the conversion of these bonds by the guardian, he and appellant should be given credit for such interest.

It appears that, after the appointment of the present guardian, it was by the court directed to mortgage the Edmonds property to Stella Crollard for thirty-two hundred dollars, as additional security on a pledge made by the guardian to her of four thousand dollars worth of bonds. Appellant argues that the present guardian should be required to satisfy this mortgage. Mr. Deming was charged, as for conversion, with the market value of the bonds at the date of the pledge. The mortgage of which appellant complains was given merely as additional security. If, for the purpose for which it was given, any liability against the Edmonds property be established under this mortgage, appellant must stand that loss. If no other liability upon this mortgage be established against the property, appellant will not be injured. The record does not warrant any further action on this matter.

It would seem that appellant is entitled to a provision in the judgment to the effect that, upon satisfying the same, it is entitled to judgment over against Mr. Deming.

Appellant contends that the judgment contains certain mathematical errors. These, if any, may be corrected upon remand.

We have painstakingly studied the 1,050 pages of briefs filed by appellant and the 1,039 pages of briefs filed by respondents. Appellant presents some other contentions, which investigation convinces us are without merit.

The cause is remanded, with instructions to modify the decree as entered, in accordance with this opinion. The court may receive further evidence, if it be deemed advisable to do so. Save as modified, the decree is affirmed.

STEINERT, C. J., MAIN, ROBINSON, and GERAGHTY, JJ., concur.

MILLARD, J. (dissenting in part)—The legislature declared—it is the only one of the three departments of government having the constitutional right so to do—the policy of this state to exact a ten per cent penalty in the event of the failure of a guardian to render a verified account "at least once in every two years, and whenever cited to do so." Rem. Rev. Stat., § 1575 [P. C. § 9907].

The majority argue that the exaction of ten per cent is a penalty and not a compensation, the imposition of which is not dependent upon the existence of any damage whatsoever, and that it is so excessive as to amount to a deprivation of property without due process of law.

It may appear to the majority to be absurd and unjust to exact a ten per cent penalty for failure to render the prescribed account and not so severely punish—measured in terms of money—one who misappropriates his ward's property. The absurdity, incongruity, or injustice stressed by the majority is not a sound basis

on which to rest the court's claim of legislative powers. Doubtless, the legislature contemplated, when it enacted the statute which the majority opinion repeals, that a criminal penalty which society may, if it so desire, require of a guardian who embezzles the property of his ward is sufficient. How much or how little punishment the legislature should fix, if not within a constitutional inhibition, is not a judicial question. By what authority is it to be determined whether the penalty in the one case shall be measured by money and in the other by imprisonment and fine? Under our system, that power is lodged with the legislative branch of the government.

In my opinion, there can be no question as to the constitutionality of the statute in question. If a statute is constitutional, it can not be against public policy. If it is constitutional, it is public policy. The remedy for the failure of the statute to cover the situation the majority have in mind—also exact ten per cent penalty of an embezzling guardian in addition to the criminal penalty that may be his portion—is for the legislature, and not for the court. It is the function of a court to declare what the law is, and not what its members as individuals think it ought to be.

If we legislate, as the majority are now doing, when we think the penalty in one case is too severe because a like penalty is not exacted of another for a different offense, we arrogate that power in defiance of the constitution. If we thus trespass, then, as a court and as individuals, we should be rather chary in our criticism and not resentful of executive and legislative invasion of the judicial province.

The citation and quotation of opinions

"That codeless myriad of precedent,
That wilderness of single instances."
                                        (Aylmer's Field)

of courts of other jurisdictions to buttress the position of the majority do not warrant our invasion of the legislative province. Too often *"Quod exemplo fit, id etiam jure fieri putant"* (Cicero, Epistles IV, 3). Our disregard of the constitution can not be justified by the fact that other courts have also encroached upon the legislative province. I can not lend reverence to even such well-established precedent. I would not be convinced that two and two were more than four, even if all of the courts of Christendom so held.

In all other respects, I agree with the majority opinion.

BLAKE and HOLCOMB, JJ., concur with MILLARD, J.